# TUAN ANH NGUYEN ET AL. *v.* IMMIGRATION AND NATURALIZATION SERVICE

No. 99–2071.   Argued January 9, 2001—Decided June 11, 2001

54

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SCALIA, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 73. O'CONNOR, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 74.

*Martha F. Davis* argued the cause for petitioners. With her on the briefs were *Nancy A. Falgout, Steven R. Shapiro, Lucas Guttentag, Julie Goldscheid,* and *Sherry J. Leiwant.*

*Deputy Solicitor General Kneedler* argued the cause for respondent. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Ogden, Austin C. Schlick, Michael Jay Singer,* and *John S. Koppel.**

JUSTICE KENNEDY delivered the opinion of the Court.

This case presents a question not resolved by a majority of the Court in a case before us three Terms ago. See *Miller* v. *Albright,* 523 U. S. 420 (1998). Title 8 U. S. C. § 1409 governs the acquisition of United States citizenship by persons born to one United States citizen parent and one noncitizen parent when the parents are unmarried and the child is born outside of the United States or its possessions. The statute imposes different requirements for the child's acquisition of citizenship depending upon whether the citizen parent is

---

*Briefs of *amici curiae* urging reversal were filed for Equality Now et al. by *Ogden Northrup Lewis* and *Jessica Neuwirth;* and for the National Women's Law Center et al. by *Nancy Duff Campbell, Joan Entmacher, Dina R. Lassow,* and *Nancy L. Perkins.*

*Moses Silverman* and *Kenneth Kimerling* filed a brief for the Asian American Legal Defense and Education Fund, Inc., as *amicus curiae.*

the mother or the father. The question before us is whether the statutory distinction is consistent with the equal protection guarantee embedded in the Due Process Clause of the Fifth Amendment.

## I

Petitioner Tuan Anh Nguyen was born in Saigon, Vietnam, on September 11, 1969, to copetitioner Joseph Boulais and a Vietnamese citizen. Boulais and Nguyen's mother were not married. Boulais always has been a citizen of the United States, and he was in Vietnam under the employ of a corporation. After he and Nguyen's mother ended their relationship, Nguyen lived for a time with the family of Boulais' new Vietnamese girlfriend. In June 1975, Nguyen, then almost six years of age, came to the United States. He became a lawful permanent resident and was raised in Texas by Boulais.

In 1992, when Nguyen was 22, he pleaded guilty in a Texas state court to two counts of sexual assault on a child. He was sentenced to eight years in prison on each count. Three years later, the United States Immigration and Naturalization Service (INS) initiated deportation proceedings against Nguyen as an alien who had been convicted of two crimes involving moral turpitude, as well as an aggravated felony. See 8 U. S. C. §§ 1227(a)(2)(A)(ii) and (iii) (1994 ed., Supp. IV). Though later he would change his position and argue he was a United States citizen, Nguyen testified at his deportation hearing that he was a citizen of Vietnam. The Immigration Judge found him deportable.

Nguyen appealed to the Board of Immigration Appeals and, in 1998, while the matter was pending, his father obtained an order of parentage from a state court, based on DNA testing. By this time, Nguyen was 28 years old. The Board dismissed Nguyen's appeal, rejecting his claim to United States citizenship because he had failed to establish compliance with 8 U. S. C. § 1409(a), which sets forth the re-

quirements for one who was born out of wedlock and abroad to a citizen father and a noncitizen mother.

Nguyen and Boulais appealed to the Court of Appeals for the Fifth Circuit, arguing that § 1409 violates equal protection by providing different rules for attainment of citizenship by children born abroad and out of wedlock depending upon whether the one parent with American citizenship is the mother or the father. The court rejected the constitutional challenge to § 1409(a). 208 F. 3d 528, 535 (2000).

The constitutionality of the distinction between unwed fathers and mothers was argued in *Miller*, but a majority of the Court did not resolve the issue. Four Justices, in two different opinions, rejected the challenge to the gender-based distinction, two finding the statute consistent with the Fifth Amendment, see 523 U. S., at 423 (opinion of STEVENS, J., joined by REHNQUIST, C. J.), and two concluding that the court could not confer citizenship as a remedy even if the statute violated equal protection, see *id.*, at 452 (SCALIA, J., joined by THOMAS, J., concurring in judgment). Three Justices reached a contrary result, and would have found the statute violative of equal protection. *Id.*, at 460 (GINSBURG, J., joined by SOUTER and BREYER, JJ., dissenting); *id.*, at 471 (BREYER, J., joined by SOUTER and GINSBURG, JJ., dissenting). Finally, two Justices did not reach the issue as to the father, having determined that the child, the only petitioner in *Miller*, lacked standing to raise the equal protection rights of his father. *Id.*, at 445 (O'CONNOR, J., joined by KENNEDY, J., concurring in judgment).

Since *Miller*, the Courts of Appeal have divided over the constitutionality of § 1409. Compare 208 F. 3d 528 (CA5 2000) (case below) with *Lake* v. *Reno*, 226 F. 3d 141 (CA2 2000), and *United States* v. *Ahumada-Aguilar*, 189 F. 3d 1121 (CA9 1999). We granted certiorari to resolve the conflict. 530 U. S. 1305 (2000). The father is before the Court in this case; and, as all agree he has standing to raise the constitutional claim, we now resolve it. We hold that § 1409(a)

is consistent with the constitutional guarantee of equal protection.

## II

The general requirement for acquisition of citizenship by a child born outside the United States and its outlying possessions and to parents who are married, one of whom is a citizen and the other of whom is an alien, is set forth in 8 U. S. C. § 1401(g). The statute provides that the child is also a citizen if, before the birth, the citizen parent had been physically present in the United States for a total of five years, at least two of which were after the parent turned 14 years of age.

As to an individual born under the same circumstances, save that the parents are unwed, § 1409(a) sets forth the following requirements where the father is the citizen parent and the mother is an alien:

"(1) a blood relationship between the person and the father is established by clear and convincing evidence,

"(2) the father had the nationality of the United States at the time of the person's birth,

"(3) the father (unless deceased) has agreed in writing to provide financial support for the person until the person reaches the age of 18 years, and

"(4) while the person is under the age of 18 years—

"(A) the person is legitimated under the law of the person's residence or domicile,

"(B) the father acknowledges paternity of the person in writing under oath, or

"(C) the paternity of the person is established by adjudication of a competent court."

In addition, § 1409(a) incorporates by reference, as to the citizen parent, the residency requirement of § 1401(g).

When the citizen parent of the child born abroad and out of wedlock is the child's mother, the requirements for the transmittal of citizenship are described in § 1409(c):

"(c) Notwithstanding the provision of subsection (a) of this section, a person born, after December 23, 1952, outside the United States and out of wedlock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States *or one of its outlying possessions* for a continuous period of one year."

Section 1409(a) thus imposes a set of requirements on the children of citizen fathers born abroad and out of wedlock to a noncitizen mother that are not imposed under like circumstances when the citizen parent is the mother. All concede the requirements of §§ 1409(a)(3) and (a)(4), relating to a citizen father's acknowledgment of a child while he is under 18, were not satisfied in this case. We need not discuss § 1409(a)(3), however. It was added in 1986, after Nguyen's birth; and Nguyen falls within a transitional rule which allows him to elect application of either the current version of the statute, or the pre-1986 version, which contained no parallel to § 1409(a)(3). See Immigration and Nationality Act Amendments of 1986, 100 Stat. 3655; note following 8 U. S. C. § 1409; *Miller, supra,* at 426, n. 3, 432 (opinion of STEVENS, J.). And in any event, our ruling respecting § 1409(a)(4) is dispositive of the case. As an individual seeking citizenship under § 1409(a) must meet all of its preconditions, the failure to satisfy § 1409(a)(4) renders Nguyen ineligible for citizenship.

## III

For a gender-based classification to withstand equal protection scrutiny, it must be established " 'at least that the [challenged] classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." ' " *United States* v. *Virginia,* 518 U. S. 515, 533

(1996) (quoting *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 724 (1982), in turn quoting *Wengler* v. *Druggists Mut. Ins. Co.*, 446 U. S. 142, 150 (1980)). For reasons to follow, we conclude § 1409 satisfies this standard. Given that determination, we need not decide whether some lesser degree of scrutiny pertains because the statute implicates Congress' immigration and naturalization power. See *Miller*, 523 U. S., at 434, n. 11 (explaining that the statute must be subjected to a standard more deferential to the congressional exercise of the immigration and naturalization power, but that "[e]ven if . . . the heightened scrutiny that normally governs gender discrimination claims applied in this context," the statute would be sustained (citations omitted)).

Before considering the important governmental interests advanced by the statute, two observations concerning the operation of the provision are in order. First, a citizen mother expecting a child and living abroad has the right to reenter the United States so the child can be born here and be a 14th Amendment citizen. From one perspective, then, the statute simply ensures equivalence between two expectant mothers who are citizens abroad if one chooses to reenter for the child's birth and the other chooses not to return, or does not have the means to do so. This equivalence is not a factor if the single citizen parent living abroad is the father. For, unlike the unmarried mother, the unmarried father as a general rule cannot control where the child will be born.

Second, although § 1409(a)(4) requires certain conduct to occur before the child of a citizen father, born out of wedlock and abroad, reaches 18 years of age, it imposes no limitations on when an individual who qualifies under the statute can claim citizenship. The statutory treatment of citizenship is identical in this respect whether the citizen parent is the mother or the father. A person born to a citizen parent of either gender may assert citizenship, assuming compliance

with statutory preconditions, regardless of his or her age. And while the conditions necessary for a citizen mother to transmit citizenship under § 1409(c) exist at birth, citizen fathers and/or their children have 18 years to satisfy the requirements of § 1409(a)(4). See *Miller, supra,* at 435 (opinion of STEVENS, J.).

The statutory distinction relevant in this case, then, is that § 1409(a)(4) requires one of three affirmative steps to be taken if the citizen parent is the father, but not if the citizen parent is the mother: legitimation; a declaration of paternity under oath by the father; or a court order of paternity. Congress' decision to impose requirements on unmarried fathers that differ from those on unmarried mothers is based on the significant difference between their respective relationships to the potential citizen at the time of birth. Specifically, the imposition of the requirement for a paternal relationship, but not a maternal one, is justified by two important governmental objectives. We discuss each in turn.

## A

The first governmental interest to be served is the importance of assuring that a biological parent-child relationship exists. In the case of the mother, the relation is verifiable from the birth itself. The mother's status is documented in most instances by the birth certificate or hospital records and the witnesses who attest to her having given birth.

In the case of the father, the uncontestable fact is that he need not be present at the birth. If he is present, furthermore, that circumstance is not incontrovertible proof of fatherhood. See *Lehr* v. *Robertson,* 463 U. S. 248, 260, n. 16 (1983) ("'The mother carries and bears the child, and in this sense her parental relationship is clear. The validity of the father's parental claims must be gauged by other measures'" (quoting *Caban* v. *Mohammed,* 441 U. S. 380, 397 (1979) (Stewart, J., dissenting))); *Trimble* v. *Gordon,* 430

U. S. 762, 770 (1977) ("The more serious problems of proving paternity might justify a more demanding standard for illegitimate children claiming under their fathers' estates than that required . . . under their mothers' estates . . ."). Fathers and mothers are not similarly situated with regard to the proof of biological parenthood. The imposition of a different set of rules for making that legal determination with respect to fathers and mothers is neither surprising nor troublesome from a constitutional perspective. Cf. *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 439 (1985) (explaining that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"); *F. S. Royster Guano Co.* v. *Virginia*, 253 U. S. 412, 415 (1920). Section 1409(a)(4)'s provision of three options for a father seeking to establish paternity—legitimation, paternity oath, and court order of paternity—is designed to ensure an acceptable documentation of paternity.

Petitioners argue that the requirement of §1409(a)(1), that a father provide clear and convincing evidence of parentage, is sufficient to achieve the end of establishing paternity, given the sophistication of modern DNA tests. Brief for Petitioners 21–24. Section 1409(a)(1) does not actually mandate a DNA test, however. The Constitution, moreover, does not require that Congress elect one particular mechanism from among many possible methods of establishing paternity, even if that mechanism arguably might be the most scientifically advanced method. With respect to DNA testing, the expense, reliability, and availability of such testing in various parts of the world may have been of particular concern to Congress. See *Miller, supra,* at 437 (opinion of STEVENS, J.). The requirement of §1409(a)(4) represents a reasonable conclusion by the legislature that the satisfaction of one of several alternatives will suffice to establish the blood link between father and child required as a predicate to the child's acquisition of citizenship. Cf. *Lehr, supra,*

at 267–268 (upholding New York statutory requirement that gave mothers of children born out of wedlock notice of an adoption hearing, but only extended that right to fathers who mailed a postcard to a "putative fathers registry"). Given the proof of motherhood that is inherent in birth itself, it is unremarkable that Congress did not require the same affirmative steps of mothers.

Finally, to require Congress to speak without reference to the gender of the parent with regard to its objective of ensuring a blood tie between parent and child would be to insist on a hollow neutrality. As JUSTICE STEVENS pointed out in *Miller*, Congress could have required both mothers and fathers to prove parenthood within 30 days or, for that matter, 18 years, of the child's birth. 523 U. S., at 436. Given that the mother is always present at birth, but that the father need not be, the facially neutral rule would sometimes require fathers to take additional affirmative steps which would not be required of mothers, whose names will appear on the birth certificate as a result of their presence at the birth, and who will have the benefit of witnesses to the birth to call upon. The issue is not the use of gender specific terms instead of neutral ones. Just as neutral terms can mask discrimination that is unlawful, gender specific terms can mark a permissible distinction. The equal protection question is whether the distinction is lawful. Here, the use of gender specific terms takes into account a biological difference between the parents. The differential treatment is inherent in a sensible statutory scheme, given the unique relationship of the mother to the event of birth.

### B

#### 1

The second important governmental interest furthered in a substantial manner by § 1409(a)(4) is the determination to ensure that the child and the citizen parent have some demonstrated opportunity or potential to develop not just a

relationship that is recognized, as a formal matter, by the law, but one that consists of the real, everyday ties that provide a connection between child and citizen parent and, in turn, the United States. See *id.*, at 438–440 (opinion of STEVENS, J.). In the case of a citizen mother and a child born overseas, the opportunity for a meaningful relationship between citizen parent and child inheres in the very event of birth, an event so often critical to our constitutional and statutory understandings of citizenship. The mother knows that the child is in being and is hers and has an initial point of contact with him. There is at least an opportunity for mother and child to develop a real, meaningful relationship.

The same opportunity does not result from the event of birth, as a matter of biological inevitability, in the case of the unwed father. Given the 9-month interval between conception and birth, it is not always certain that a father will know that a child was conceived, nor is it always clear that even the mother will be sure of the father's identity. This fact takes on particular significance in the case of a child born overseas and out of wedlock. One concern in this context has always been with young people, men for the most part, who are on duty with the Armed Forces in foreign countries. See Department of Defense, Selected Manpower Statistics 48, 74 (1999) (reporting that in 1969, the year in which Nguyen was born, there were 3,458,072 active duty military personnel, 39,506 of whom were female); Department of Defense, Selected Manpower Statistics 29 (1970) (noting that 1,041,094 military personnel were stationed in foreign countries in 1969); Department of Defense, Selected Manpower Statistics 49, 76 (1999) (reporting that in 1999 there were 1,385,703 active duty military personnel, 200,287 of whom were female); *id.*, at 33 (noting that 252,763 military personnel were stationed in foreign countries in 1999).

When we turn to the conditions which prevail today, we find that the passage of time has produced additional and even more substantial grounds to justify the statutory dis-

tinction. The ease of travel and the willingness of Americans to visit foreign countries have resulted in numbers of trips abroad that must be of real concern when we contemplate the prospect of accepting petitioners' argument, which would mandate, contrary to Congress' wishes, citizenship by male parentage subject to no condition save the father's previous length of residence in this country. In 1999 alone, Americans made almost 25 million trips abroad, excluding trips to Canada and Mexico. See U. S. Dept. of Commerce, 1999 Profile of U. S. Travelers to Overseas Destinations 1 (Oct. 2000). Visits to Canada and Mexico add to this figure almost 34 million additional visits. See U. S. Dept. of Commerce, U. S. Resident Travel to Overseas Countries, Historical Visitation 1989–1999, p. 1 (Oct. 2000). And the average American overseas traveler spent 15.1 nights out of the United States in 1999. 1999 Profile of U. S. Travelers to Overseas Destinations, *supra*, at 4.

Principles of equal protection do not require Congress to ignore this reality. To the contrary, these facts demonstrate the critical importance of the Government's interest in ensuring some opportunity for a tie between citizen father and foreign born child which is a reasonable substitute for the opportunity manifest between mother and child at the time of birth. Indeed, especially in light of the number of Americans who take short sojourns abroad, the prospect that a father might not even know of the conception is a realistic possibility. See *Miller, supra,* at 439 (opinion of STEVENS, J.). Even if a father knows of the fact of conception, moreover, it does not follow that he will be present at the birth of the child. Thus, unlike the case of the mother, there is no assurance that the father and his biological child will ever meet. Without an initial point of contact with the child by a father who knows the child is his own, there is no opportunity for father and child to begin a relationship. Section 1409 takes the unremarkable step of ensuring that such an opportunity, inherent in the event of birth as to the

mother-child relationship, exists between father and child before citizenship is conferred upon the latter.

The importance of the governmental interest at issue here is too profound to be satisfied merely by conducting a DNA test. The fact of paternity can be established even without the father's knowledge, not to say his presence. Paternity can be established by taking DNA samples even from a few strands of hair, years after the birth. See Federal Judicial Center, Reference Manual on Scientific Evidence 497 (2d ed. 2000). Yet scientific proof of biological paternity does nothing, by itself, to ensure contact between father and child during the child's minority.

Congress is well within its authority in refusing, absent proof of at least the opportunity for the development of a relationship between citizen parent and child, to commit this country to embracing a child as a citizen entitled as of birth to the full protection of the United States, to the absolute right to enter its borders, and to full participation in the political process. If citizenship is to be conferred by the unwitting means petitioners urge, so that its acquisition abroad bears little relation to the realities of the child's own ties and allegiances, it is for Congress, not this Court, to make that determination. Congress has not taken that path but has instead chosen, by means of § 1409, to ensure in the case of father and child the opportunity for a relationship to develop, an opportunity which the event of birth itself provides for the mother and child. It should be unobjectionable for Congress to require some evidence of a minimal opportunity for the development of a relationship with the child in terms the male can fulfill.

While the INS' brief contains statements indicating the governmental interest we here describe, see Brief for Respondent 38, 41, it suggests other interests as well. Statements from the INS' brief are not conclusive as to the objects of the statute, however, as we are concerned with the objectives of Congress, not those of the INS. We ascertain the

purpose of a statute by drawing logical conclusions from its text, structure, and operation.

Petitioners and their *amici* argue in addition that, rather than fulfilling an important governmental interest, § 1409 merely embodies a gender-based stereotype. Although the above discussion should illustrate that, contrary to petitioners' assertions, § 1409 addresses an undeniable difference in the circumstance of the parents at the time a child is born, it should be noted, furthermore, that the difference does not result from some stereotype, defined as a frame of mind resulting from irrational or uncritical analysis. There is nothing irrational or improper in the recognition that at the moment of birth—a critical event in the statutory scheme and in the whole tradition of citizenship law—the mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father. This is not a stereotype. See *Virginia*, 518 U. S., at 533 ("The heightened review standard our precedent establishes does not make sex a proscribed classification. . . . Physical differences between men and women . . . are enduring").

2

Having concluded that facilitation of a relationship between parent and child is an important governmental interest, the question remains whether the means Congress chose to further its objective—the imposition of certain additional requirements upon an unwed father—substantially relate to that end. Under this test, the means Congress adopted must be sustained.

First, it should be unsurprising that Congress decided to require that an opportunity for a parent-child relationship occur during the formative years of the child's minority. In furtherance of the desire to ensure some tie between this country and one who seeks citizenship, various other statutory provisions concerning citizenship and naturalization require some act linking the child to the United States to

occur before the child reaches 18 years of age. See, *e. g.*, 8 U. S. C. § 1431 (child born abroad to one citizen parent and one noncitizen parent shall become a citizen if, *inter alia*, the noncitizen parent is naturalized before the child reaches 18 years of age and the child begins to reside in the United States before he or she turns 18); § 1432 (imposing same conditions in the case of a child born abroad to two alien parents who are naturalized).

Second, petitioners argue that § 1409(a)(4) is not effective. In particular, petitioners assert that, although a mother will know of her child's birth, "knowledge that one is a parent, no matter how it is acquired, does not guarantee a relationship with one's child." Brief for Petitioners 16. They thus maintain that the imposition of the additional requirements of § 1409(a)(4) only on the children of citizen fathers must reflect a stereotype that women are more likely than men to actually establish a relationship with their children. *Id.*, at 17.

This line of argument misconceives the nature of both the governmental interest at issue and the manner in which we examine statutes alleged to violate equal protection. As to the former, Congress would of course be entitled to advance the interest of ensuring an actual, meaningful relationship in every case before citizenship is conferred. Or Congress could excuse compliance with the formal requirements when an actual father-child relationship is proved. It did neither here, perhaps because of the subjectivity, intrusiveness, and difficulties of proof that might attend an inquiry into any particular bond or tie. Instead, Congress enacted an easily administered scheme to promote the different but still substantial interest of ensuring at least an opportunity for a parent-child relationship to develop. Petitioners' argument confuses the means and ends of the equal protection inquiry; § 1409(a)(4) should not be invalidated because Congress elected to advance an interest that is less demanding to satisfy than some other alternative.

70

Even if one conceives of the interest Congress pursues as the establishment of a real, practical relationship of considerable substance between parent and child in every case, as opposed simply to ensuring the potential for the relationship to begin, petitioners' misconception of the nature of the equal protection inquiry is fatal to their argument. A statute meets the equal protection standard we here apply so long as it is " ' " "substantially related to the achievement of " ' " the governmental objective in question. *Virginia*, *supra*, at 533 (quoting *Hogan*, 458 U. S., at 724, in turn quoting *Wengler*, 446 U. S., at 150). It is almost axiomatic that a policy which seeks to foster the opportunity for meaningful parent-child bonds to develop has a close and substantial bearing on the governmental interest in the actual formation of that bond. None of our gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance. In this difficult context of conferring citizenship on vast numbers of persons, the means adopted by Congress are in substantial furtherance of important governmental objectives. The fit between the means and the important end is "exceedingly persuasive." See *Virginia*, *supra*, at 533. We have explained that an "exceedingly persuasive justification" is established "by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " *Hogan*, *supra*, at 724 (citations omitted). Section 1409 meets this standard.

## C

In analyzing § 1409(a)(4), we are mindful that the obligation it imposes with respect to the acquisition of citizenship by the child of a citizen father is minimal. This circumstance shows that Congress has not erected inordinate and unnecessary hurdles to the conferral of citizenship on the

children of citizen fathers in furthering its important objectives. Only the least onerous of the three options provided for in § 1409(a)(4) must be satisfied. If the child has been legitimated under the law of the relevant jurisdiction, that will be the end of the matter. See § 1409(a)(4)(A). In the alternative, a father who has not legitimated his child by formal means need only make a written acknowledgment of paternity under oath in order to transmit citizenship to his child, hardly a substantial burden. See § 1409(a)(4)(B). Or, the father could choose to obtain a court order of paternity. See § 1409(a)(4)(C). The statute can be satisfied on the day of birth, or the next day, or for the next 18 years. In this case, the unfortunate, even tragic, circumstance is that Boulais did not pursue, or perhaps did not know of, these simple steps and alternatives. Any omission, however, does not nullify the statutory scheme.

Section 1409(a), moreover, is not the sole means by which the child of a citizen father can attain citizenship. An individual who fails to comply with § 1409(a), but who has substantial ties to the United States, can seek citizenship in his or her own right, rather than via reliance on ties to a citizen parent. See, e. g., 8 U. S. C. §§ 1423, 1427. This option now may be foreclosed to Nguyen, but any bar is due to the serious nature of his criminal offenses, not to an equal protection denial or to any supposed rigidity or harshness in the citizenship laws.

## IV

The statutory scheme's satisfaction of the equal protection scrutiny we apply to gender-based classifications constitutes a sufficient basis for upholding it. It should be noted, however, that, even were we to conclude that the statute did not meet this standard of review, petitioners would face additional obstacles before they could prevail.

The INS urges that, irrespective of whether § 1409(a) is constitutional, the Court cannot grant the relief petitioners request: the conferral of citizenship on terms other than

those specified by Congress. There may well be "potential problems with fashioning a remedy" were we to find the statute unconstitutional. See *Miller*, 523 U. S., at 451 (O'CONNOR, J., concurring in judgment); cf. *id.*, at 445, n. 26 (opinion of STEVENS, J.) (declining to address the question whether the Court could confer the sought-after remedy). Two Members of today's majority said in *Miller* that this argument was dispositive. See *id.*, at 452–459 (SCALIA, J., joined by THOMAS, J., concurring in judgment). Petitioners ask us to invalidate and sever §§ 1409(a)(3) and (a)(4), but it must be remembered that severance is based on the assumption that Congress would have intended the result. See *id.*, at 457 (SCALIA, J., concurring in judgment) (citing *New York* v. *United States*, 505 U. S. 144 (1992)). In this regard, it is significant that, although the Immigration and Nationality Act contains a general severability provision, Congress expressly provided with respect to the very sub-chapter of the United States Code at issue and in a provision entitled "Sole procedure" that "[a] person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter and not otherwise." 8 U. S. C. § 1421(d); see also *Miller, supra*, at 457–458 (SCALIA, J., concurring in judgment). Section 1421(d) refers to naturalization, which in turn is defined as "conferring of nationality of a state upon a person after birth." 8 U. S. C. § 1101(a)(23). Citizenship under § 1409(a) is retroactive to the date of birth, but it is a naturalization under § 1421(d) nevertheless. The conditions specified by § 1409(a) for conferral of citizenship, as a matter of definition, must take place after the child is born, in some instances taking as long as 18 years. Section 1409(a), then, is subject to the limitation imposed by § 1421(d).

In light of our holding that there is no equal protection violation, we need not rely on this argument. For the same reason, we need not assess the implications of statements in our earlier cases regarding the wide deference afforded to

Congress in the exercise of its immigration and naturalization power. See, e. g., *Fiallo* v. *Bell*, 430 U. S. 787, 792–793, and n. 4 (1977) (quoting *Galvan* v. *Press*, 347 U. S. 522, 531 (1954)); 430 U. S., at 792 (quoting *Oceanic Steam Nav. Co.* v. *Stranahan*, 214 U. S. 320, 339 (1909)). These arguments would have to be considered, however, were it to be determined that § 1409 did not withstand conventional equal protection scrutiny.

## V

To fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it. Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real. The distinction embodied in the statutory scheme here at issue is not marked by misconception and prejudice, nor does it show disrespect for either class. The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific to each gender.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I remain of the view that the Court lacks power to provide relief of the sort requested in this suit—namely, conferral of citizenship on a basis other than that prescribed by Congress. See *Miller* v. *Albright*, 523 U. S. 420, 452 (1998) (SCALIA, J., concurring in judgment). A majority of the Justices in *Miller* having concluded otherwise, see *id.*, at 423 (opinion of STEVENS, J., joined by REHNQUIST, C. J.); *id.*, at 460 (GINSBURG, J., joined by SOUTER and BREYER, JJ., dissenting); *id.*, at 471 (BREYER, J., joined by SOUTER and

GINSBURG, JJ., dissenting); and a majority of the Court today proceeding on the same assumption; I think it appropriate for me to reach the merits of petitioners' equal protection claims. I join the opinion of the Court.

JUSTICE O'CONNOR, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

In a long line of cases spanning nearly three decades, this Court has applied heightened scrutiny to legislative classifications based on sex. The Court today confronts another statute that classifies individuals on the basis of their sex. While the Court invokes heightened scrutiny, the manner in which it explains and applies this standard is a stranger to our precedents. Because the Immigration and Naturalization Service (INS) has not shown an exceedingly persuasive justification for the sex-based classification embodied in 8 U. S. C. § 1409(a)(4)—i. e., because it has failed to establish at least that the classification substantially relates to the achievement of important governmental objectives—I would reverse the judgment of the Court of Appeals.

I

Sex-based statutes, even when accurately reflecting the way most men or women behave, deny individuals opportunity. Such generalizations must be viewed not in isolation, but in the context of our Nation's " 'long and unfortunate history of sex discrimination.' " *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 136 (1994) (quoting *Frontiero* v. *Richardson*, 411 U. S. 677, 684 (1973) (plurality opinion)). Sex-based generalizations both reflect and reinforce "fixed notions concerning the roles and abilities of males and females." *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 725 (1982).

For these reasons, a party who seeks to defend a statute that classifies individuals on the basis of sex "must carry the burden of showing an 'exceedingly persuasive justification' for the classification." *Id.*, at 724 (quoting *Kirchberg* v.

*Feenstra,* 450 U. S. 455, 461 (1981)); see also *United States v. Virginia,* 518 U. S. 515, 531 (1996). The defender of the classification meets this burden "only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Mississippi Univ. for Women, supra,* at 724 (quoting *Wengler* v. *Druggists Mut. Ins. Co.,* 446 U. S. 142, 150 (1980)); see also *Virginia,* 518 U. S., at 533.

Our cases provide significant guidance concerning the meaning of this standard and how a reviewing court is to apply it. This Court's instruction concerning the application of heightened scrutiny to sex-based classifications stands in stark contrast to our elucidation of the rudiments of rational basis review. To begin with, under heightened scrutiny, "[t]he burden of justification is demanding and it rests entirely on [the party defending the classification]." *Ibid.* Under rational basis scrutiny, by contrast, the defender of the classification "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller* v. *Doe,* 509 U. S. 312, 320 (1993). Instead, "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Id.,* at 320–321 (internal quotation marks and citation omitted).

Further, a justification that sustains a sex-based classification "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Virginia, supra,* at 533. "[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648 (1975). Under rational basis review, by contrast, it is "'constitutionally irrelevant [what] reasoning in fact underlay the legislative decision.'" *Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166,

179 (1980) (quoting *Flemming* v. *Nestor*, 363 U. S. 603, 612 (1960)).

Heightened scrutiny does not countenance justifications that "rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia, supra,* at 533. Rational basis review, by contrast, is much more tolerant of the use of broad generalizations about different classes of individuals, so long as the classification is not arbitrary or irrational. See, *e. g., Kimel* v. *Florida Bd. of Regents,* 528 U. S. 62, 84 (2000); *Fritz, supra,* at 177.

Moreover, overbroad sex-based generalizations are impermissible even when they enjoy empirical support. See, *e. g., J. E. B., supra,* at 139, n. 11; *Craig* v. *Boren,* 429 U. S. 190, 199 (1976); *Wiesenfeld, supra,* at 645. Under rational basis scrutiny, however, empirical support is not even necessary to sustain a classification. See, *e. g., FCC* v. *Beach Communications, Inc.,* 508 U. S. 307, 315 (1993) ("[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data").

The different burdens imposed by these equal protection standards correspond to the different duties of a reviewing court in applying each standard. The court's task in applying heightened scrutiny to a sex-based classification is clear: "Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.'" *Virginia,* 518 U. S., at 532–533. In making this determination, the court must inquire into the actual purposes of the discrimination, for "a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." *Id.,* at 535–536; see also *id.,* at 533; *Wiesenfeld, supra,* at 648; *Califano* v. *Goldfarb,* 430 U. S. 199, 212–217 (1977) (plurality opinion); *id.,* at 219–221 (STEVENS, J., concurring in judgment). The

rational basis standard, on the other hand, instructs that "a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Heller, supra,* at 320 (quoting *Beach Communications, supra,* at 313). This standard permits a court to hypothesize interests that might support legislative distinctions, whereas heightened scrutiny limits the realm of justification to demonstrable reality.

These different standards of equal protection review also set different bars for the magnitude of the governmental interest that justifies the statutory classification. Heightened scrutiny demands that the governmental interest served by the classification be "important," see, *e. g., Virginia, supra,* at 533, whereas rational basis scrutiny requires only that the end be "legitimate," see, *e. g., Nordlinger* v. *Hahn,* 505 U. S. 1, 10 (1992).

The most important difference between heightened scrutiny and rational basis review, of course, is the required fit between the means employed and the ends served. Under heightened scrutiny, the discriminatory means must be "substantially related" to an actual and important governmental interest. See, *e. g., Virginia, supra,* at 533. Under rational basis scrutiny, the means need only be "rationally related" to a conceivable and legitimate state end. See, *e. g., Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 440 (1985).

The fact that other means are better suited to the achievement of governmental ends therefore is of no moment under rational basis review. See, *e. g., Vance* v. *Bradley,* 440 U. S. 93, 103, n. 20 (1979) ("Even were it not irrelevant to [rational basis review] that other alternatives might achieve approximately the same results . . ."); *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 316 (1976) *(per curiam)* ("[T]he State perhaps has not chosen the best means to accomplish this purpose. But where rationality is the test, a

State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect'" (quoting *Dandridge* v. *Williams*, 397 U. S. 471, 485 (1970))). But because we require a much tighter fit between means and ends under heightened scrutiny, the availability of sex-neutral alternatives to a sex-based classification is often highly probative of the validity of the classification. See, *e. g.*, *Wengler*, 446 U. S., at 151 (invalidating a sex-based classification where a sex-neutral approach would completely serve the needs of both classes); *Orr* v. *Orr*, 440 U. S. 268, 281 (1979) (finding "no reason, therefore, to use sex as a proxy for need" where the alimony statute already provided for individualized hearings that took financial circumstances into account); *Wiesenfeld*, 420 U. S., at 653 (finding a gender-based distinction to be "gratuitous" where "without it, the statutory scheme would only provide benefits to those men who are in fact similarly situated to the women the statute aids").

## II

The Court recites the governing substantive standard for heightened scrutiny of sex-based classifications, see *ante*, at 60–61, 70, but departs from the guidance of our precedents concerning such classifications in several ways. In the first sentence of its equal protection analysis, the majority glosses over the crucial matter of the burden of justification. *Ante*, at 60 ("For a gender-based classification to withstand equal protection scrutiny, it must be established . . ."); see also *ante*, at 70. In other circumstances, the Court's use of an impersonal construction might represent a mere elision of what we have stated expressly in our prior cases. Here, however, the elision presages some of the larger failings of the opinion.

For example, the majority hypothesizes about the interests served by the statute and fails adequately to inquire into the actual purposes of § 1409(a)(4). The Court also does not always explain adequately the importance

of the interests that it claims to be served by the provision. The majority also fails carefully to consider whether the sex-based classification is being used impermissibly "as a 'proxy for other, more germane bases of classification,'" *Mississippi Univ. for Women*, 458 U. S., at 726 (quoting *Craig*, 429 U. S., at 198), and instead casually dismisses the relevance of available sex-neutral alternatives. And, contrary to the majority's conclusion, the fit between the means and ends of § 1409(a)(4) is far too attenuated for the provision to survive heightened scrutiny. In all, the majority opinion represents far less than the rigorous application of heightened scrutiny that our precedents require.

## A

According to the Court, "[t]he first governmental interest to be served is the importance of assuring that a biological parent-child relationship exists." *Ante*, at 62. The majority does not elaborate on the importance of this interest, which presumably lies in preventing fraudulent conveyances of citizenship. Nor does the majority demonstrate that this is one of the actual purposes of § 1409(a)(4). Assuming that Congress actually had this purpose in mind in enacting parts of § 1409(a)(4), cf. *Miller* v. *Albright*, 523 U. S. 420, 435–436 (1998) (opinion of STEVENS, J.), the INS does not appear to rely on this interest in its effort to sustain § 1409(a)(4)'s sex-based classification. Cf. Brief for Respondent 11 (claiming that § 1409 serves "at least two important interests: first, ensuring that children who are born abroad out of wedlock have, during their minority, attained a sufficiently recognized or formal relationship to their United States citizen parent—and thus to the United States—to justify the conferral of citizenship upon them; and second, preventing such children from being stateless"). In light of the reviewing court's duty to "determine whether the proffered justification is 'exceedingly persuasive,'" *Virginia*, 518 U. S., at 533, this disparity between the majority's defense of the statute

and the INS' proffered justifications is striking, to say the least.

The gravest defect in the Court's reliance on this interest, however, is the insufficiency of the fit between § 1409(a)(4)'s discriminatory means and the asserted end. Section 1409(c) imposes no particular burden of proof on mothers wishing to convey citizenship to their children. By contrast, § 1409(a)(1), which petitioners do not challenge before this Court, requires that "a blood relationship between the person and the father [be] established by clear and convincing evidence." Atop § 1409(a)(1), § 1409(a)(4) requires legitimation, an acknowledgment of paternity in writing under oath, or an adjudication of paternity before the child reaches the age of 18. It is difficult to see what § 1409(a)(4) accomplishes in furtherance of "assuring that a biological parent-child relationship exists," *ante*, at 62, that § 1409(a)(1) does not achieve on its own. The virtual certainty of a biological link that modern DNA testing affords reinforces the sufficiency of § 1409(a)(1). See *Miller, supra*, at 484–485 (BREYER, J., dissenting).

It is also difficult to see how § 1409(a)(4)'s limitation of the time allowed for obtaining proof of paternity substantially furthers the assurance of a blood relationship. Modern DNA testing, in addition to providing accuracy unmatched by other methods of establishing a biological link, essentially negates the evidentiary significance of the passage of time. Moreover, the application of § 1409(a)(1)'s "clear and convincing evidence" requirement can account for any effect that the passage of time has on the quality of the evidence.

The Court criticizes petitioners' reliance on the availability and sophistication of modern DNA tests, *ante*, at 63, but appears to misconceive the relevance of such tests. No one argues that § 1409(a)(1) mandates a DNA test. Legitimation or an adjudication of paternity, see §§ 1409(a)(4)(A), (C), may well satisfy the "clear and convincing" standard of

§ 1409(a)(1). (Satisfaction of § 1409(a)(4) by a written acknowledgment of paternity under oath, see § 1409(a)(4)(B), would seem to do little, if anything, to advance the assurance of a blood relationship, further stretching the means-end fit in this context.) Likewise, petitioners' argument does not depend on the idea that one particular method of establishing paternity is constitutionally required. Petitioners' argument rests instead on the fact that, if the goal is to obtain proof of paternity, the existence of a statutory provision governing such proof, coupled with the efficacy and availability of modern technology, is highly relevant to the sufficiency of the tailoring between § 1409(a)(4)'s sex-based classification and the asserted end. Because § 1409(a)(4) adds little to the work that § 1409(a)(1) does on its own, it is difficult to say that § 1409(a)(4) "substantially furthers" an important governmental interest. *Kirchberg*, 450 U. S., at 461.

The majority concedes that Congress could achieve the goal of assuring a biological parent-child relationship in a sex-neutral fashion, but then, in a surprising turn, dismisses the availability of sex-neutral alternatives as irrelevant. As the Court suggests, "Congress could have required both mothers and fathers to prove parenthood within 30 days or, for that matter, 18 years, of the child's birth." *Ante*, at 64 (citing *Miller, supra*, at 436 (opinion of STEVENS, J.)). Indeed, whether one conceives the majority's asserted interest as assuring the existence of a biological parent-child relationship, *ante*, at 62, or as ensuring acceptable documentation of that relationship, *ante*, at 63, a number of sex-neutral arrangements—including the one that the majority offers—would better serve that end. As the majority seems implicitly to acknowledge at one point, *ante*, at 62, a mother will not always have formal legal documentation of birth because a birth certificate may not issue or may subsequently be lost. Conversely, a father's name may well appear on a birth certificate. While it is doubtless true that a mother's blood re-

lation to a child is uniquely "verifiable from the birth itself" to those present at birth, *ibid.*, the majority has not shown that a mother's birth relation is uniquely verifiable *by the INS*, much less that any greater verifiability warrants a sex-based, rather than a sex-neutral, statute.

In our prior cases, the existence of comparable or superior sex-neutral alternatives has been a powerful reason to reject a sex-based classification. See *supra*, at 78. The majority, however, turns this principle on its head by denigrating as "hollow" the very neutrality that the law requires. *Ante*, at 64. While the majority trumpets the availability of superior sex-neutral alternatives as confirmation of § 1409(a)(4)'s validity, our precedents demonstrate that this fact is a decided strike *against* the law. Far from being "hollow," the avoidance of gratuitous sex-based distinctions is the hallmark of equal protection. Cf. *J. E. B.*, 511 U. S., at 152–153 (KENNEDY, J., concurring in judgment) ("'At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial [or] sexual . . . class'" (quoting *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 602 (1990) (O'CONNOR, J., dissenting))).

The majority's acknowledgment of the availability of sex-neutral alternatives scarcely confirms the point that "[t]he differential treatment is inherent in a sensible statutory scheme." *Ante*, at 64. The discussion instead demonstrates that, at most, differential *impact* will result from the fact that "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." *Ante*, at 63. In other words, it will likely be easier for mothers to satisfy a sex-neutral proof of parentage requirement. But facially neutral laws that have a disparate impact are a different animal for purposes of constitutional analysis than laws that specifically provide for disparate treatment. We have long held that the differential impact of a facially neutral law does not trigger heightened scrutiny, see, *e. g.*,

*Washington* v. *Davis*, 426 U. S. 229 (1976), whereas we apply heightened scrutiny to laws that facially classify individuals on the basis of their sex.   See, *e. g.*, *United States* v. *Virginia*, 518 U. S. 515 (1996); see also *J. E. B.*, *supra*, at 152 (KENNEDY, J., concurring in judgment) ("[O]ur case law does reveal a strong presumption that gender classifications are invalid"); *Parham* v. *Hughes*, 441 U. S. 347, 351 (1979) (plurality opinion) ("Not all legislation, however, is entitled to the same presumption of validity. . . . [T]he presumption of statutory validity may also be undermined when a State has enacted legislation creating classes based upon certain other immutable human attributes" (citing, *inter alia, Reed* v. *Reed*, 404 U. S. 71 (1971))).

If rational basis scrutiny were appropriate in this case, then the claim that "[t]he Constitution . . . does not require that Congress elect one particular mechanism from among many possible methods of establishing paternity," *ante*, at 63, would have much greater force.   So too would the claim that "[t]he requirement of § 1409(a)(4) represents a reasonable conclusion . . . ." *Ibid.* But fidelity to the Constitution's pledge of equal protection demands more when a facially sex-based classification is at issue.   This is not because we sit in judgment of the wisdom of laws in one instance but not the other, cf. *Beach Communications*, 508 U. S., at 313, but rather because of the potential for "injury . . . to personal dignity," *J. E. B.*, *supra*, at 153 (KENNEDY, J., concurring in judgment), that inheres in or accompanies so many sex-based classifications.

## B

The Court states that "[t]he second important governmental interest furthered in a substantial manner by § 1409(a)(4) is the determination to ensure that the child and the citizen parent have some demonstrated opportunity or potential to develop not just a relationship that is recognized, as a formal matter, by the law, but one that consists of the real,

everyday ties that provide a connection between child and citizen parent and, in turn, the United States." *Ante,* at 64–65. The Court again fails to demonstrate that this was Congress' actual purpose in enacting § 1409(a)(4). The majority's focus on "some demonstrated opportunity or potential to develop . . . real, everyday ties" in fact appears to be the type of hypothesized rationale that is insufficient under heightened scrutiny. See *supra,* at 75–77.

The INS asserts the governmental interest of "ensuring that children who are born abroad out of wedlock have, during their minority, attained a sufficiently recognized or formal relationship to their United States citizen parent—and thus to the United States—to justify the conferral of citizenship upon them." Brief for Respondent 11. The majority's asserted end, at best, is a simultaneously watered-down and beefed-up version of this interest asserted by the INS. The majority's rendition is weaker than the INS' in that it emphasizes the "opportunity or potential to develop" a relationship rather than the actual relationship about which the INS claims Congress was concerned. The majority's version is also stronger in that it goes past the formal relationship apparently desired by the INS to "real, everyday ties."

Assuming, as the majority does, that Congress was actually concerned about ensuring a "demonstrated opportunity" for a relationship, it is questionable whether such an opportunity qualifies as an "important" governmental interest apart from the existence of an actual relationship. By focusing on "opportunity" rather than reality, the majority presumably improves the chances of a sufficient means-end fit. But in doing so, it dilutes significantly the weight of the interest. It is difficult to see how, in this citizenship-conferral context, anyone profits from a "demonstrated opportunity" for a relationship in the absence of the fruition of an actual tie. Children who have an "opportunity" for such a tie with a parent, of course, may never develop an actual rela-

tionship with that parent. See *Miller*, 523 U. S., at 440 (opinion of STEVENS, J.). If a child grows up in a foreign country without any postbirth contact with the citizen parent, then the child's never-realized "opportunity" for a relationship with the citizen seems singularly irrelevant to the appropriateness of granting citizenship to that child. Likewise, where there is an actual relationship, it is the actual relationship that does all the work in rendering appropriate a grant of citizenship, regardless of when and how the opportunity for that relationship arose.

Accepting for the moment the majority's focus on "opportunity," the attempt to justify § 1409(a)(4) in these terms is still deficient. Even if it is important "to require that an opportunity for a parent-child relationship occur during the formative years of the child's minority," *ante,* at 68, it is difficult to see how the requirement that *proof* of such opportunity be obtained before the child turns 18 substantially furthers the asserted interest. As the facts of this case demonstrate, *ante,* at 57, it is entirely possible that a father and child will have the opportunity to develop a relationship and in fact will develop a relationship without obtaining the proof of the opportunity during the child's minority. After his parents' relationship had ended, petitioner Nguyen lived with the family of his father's new girlfriend. In 1975, before his sixth birthday, Nguyen came to the United States, where he was reared by his father, petitioner Boulais. In 1997, a DNA test showed a 99.98% probability of paternity, and, in 1998, Boulais obtained an order of parentage from a Texas court.

Further underscoring the gap between the discriminatory means and the asserted end is the possibility that "a child might obtain an adjudication of paternity 'absent any affirmative act by the father, and perhaps even over his express objection.'" *Miller*, 523 U. S., at 486 (BREYER, J., dissenting) (quoting *id.,* at 434 (opinion of STEVENS, J.)). The fact that the means-end fit can break down so readily

in theory, and not just in practice, is hardly characteristic of a "substantial" means-end relationship.

Moreover, available sex-neutral alternatives would at least replicate, and could easily exceed, whatever fit there is between § 1409(a)(4)'s discriminatory means and the majority's asserted end. According to the Court, § 1409(a)(4) is designed to ensure that fathers and children have the same "opportunity which the event of birth itself provides for the mother and child." *Ante,* at 67. Even assuming that this is so, Congress could simply substitute for § 1409(a)(4) a requirement that the parent be present at birth or have knowledge of birth. Cf. *Miller, supra,* at 487 (BREYER, J., dissenting). Congress could at least allow proof of such presence or knowledge to be one way of demonstrating an opportunity for a relationship. Under the present law, the statute on its face accords different treatment to a mother who is by nature present at birth and a father who is by choice present at birth even though those two individuals are similarly situated with respect to the "opportunity" for a relationship. The mother can transmit her citizenship at birth, but the father cannot do so in the absence of at least one other affirmative act. The different statutory treatment is solely on account of the sex of the similarly situated individuals. This type of treatment is patently inconsistent with the promise of equal protection of the laws. See, *e. g., Reed,* 404 U. S., at 77 ("By providing dissimilar treatment for men and women who are thus similarly situated, the challenged section violates the Equal Protection Clause").

Indeed, the idea that a mother's presence at birth supplies adequate assurance of an opportunity to develop a relationship while a father's presence at birth does not would appear to rest only on an overbroad sex-based generalization. A mother may not have an opportunity for a relationship if the child is removed from his or her mother on account of alleged abuse or neglect, or if the child and mother are separated by tragedy, such as disaster or war,

of the sort apparently present in this case. There is no reason, other than stereotype, to say that fathers who are present at birth lack an opportunity for a relationship on similar terms. The "[p]hysical differences between men and women," *Virginia*, 518 U. S., at 533, therefore do not justify § 1409(a)(4)'s discrimination.

The majority later ratchets up the interest, for the sake of argument, to "the establishment of a real, practical relationship of considerable substance between parent and child in every case, as opposed simply to ensuring the potential for the relationship to begin." *Ante*, at 70. But the majority then dismisses the distinction between opportunity and reality as immaterial to the inquiry in this case. *Ibid.* The majority rests its analysis of the means-end fit largely on the following proposition: "It is almost axiomatic that a policy which seeks to foster the opportunity for meaningful parent-child bonds to develop has a close and substantial bearing on the governmental interest in the actual formation of that bond." *Ibid.* A bare assertion of what is allegedly "almost axiomatic," however, is no substitute for the "demanding" burden of justification borne by the defender of the classification. *Virginia, supra*, at 533.

Moreover, the Court's reasoning hardly conforms to the tailoring requirement of heightened scrutiny. The fact that a discriminatory policy embodies the good intention of "seek[ing] to foster" the opportunity for something beneficial to happen is of little relevance in itself to whether the policy substantially furthers the desired occurrence. Whether the classification indeed "has a close and substantial bearing" on the actual occurrence of the preferred result depends on facts and circumstances and must be proved by the classification's defender. Far from being a virtual axiom, the relationship between the intent to foster an opportunity and the fruition of the desired effect is merely a contingent proposition. The majority's sweeping claim is no surrogate

for the careful application of heightened scrutiny to a particular classification.

The question that then remains is the sufficiency of the fit between § 1409(a)(4)'s discriminatory means and the goal of "establish[ing] . . . a real, practical relationship of considerable substance." *Ante*, at 70. If Congress wishes to advance this end, it could easily do so by employing a sex-neutral classification that is a far "more germane bas[i]s of classification" than sex, *Craig*, 429 U. S., at 198. For example, Congress could require some degree of regular contact between the child and the citizen parent over a period of time. See *Miller*, 523 U. S., at 470 (GINSBURG, J., dissenting).

The majority again raises this possibility of the use of sex-neutral means only to dismiss it as irrelevant. The Court admits that "Congress could excuse compliance with the formal requirements when an actual father-child relationship is proved," but speculates that Congress did not do so "perhaps because of the subjectivity, intrusiveness, and difficulties of proof that might attend an inquiry into any particular bond or tie." *Ante*, at 69. We have repeatedly rejected efforts to justify sex-based classifications on the ground of administrative convenience. See, *e. g., Wengler*, 446 U. S., at 152; *Frontiero*, 411 U. S., at 690–691. There is no reason to think that this is a case where administrative convenience concerns are so powerful that they would justify the sex-based discrimination, cf. *Wengler, supra*, at 152, especially where the use of sex as a proxy is so ill fit to the purported ends as it is here. And to the extent Congress might seek simply to ensure an "opportunity" for a relationship, little administrative inconvenience would seem to accompany a sex-neutral requirement of presence at birth, knowledge of birth, or contact between parent and child prior to a certain age.

The claim that § 1409(a)(4) substantially relates to the achievement of the goal of a "real, practical relationship"

thus finds support not in biological differences but instead in a stereotype—*i. e.*, "the generalization that mothers are significantly more likely than fathers . . . to develop caring relationships with their children." *Miller, supra,* at 482–483 (BREYER, J., dissenting). Such a claim relies on "the very stereotype the law condemns," *J. E. B.,* 511 U. S., at 138 (internal quotation marks omitted), "lends credibility" to the generalization, *Mississippi Univ. for Women,* 458 U. S., at 730, and helps to convert that "assumption" into "a self-fulfilling prophecy," *ibid.* See also *J. E. B., supra,* at 140 ("When state actors exercise peremptory challenges in reliance on gender stereotypes, they ratify and reinforce prejudicial views of the relative abilities of men and women"). Indeed, contrary to this stereotype, Boulais has reared Nguyen, while Nguyen apparently has lacked a relationship with his mother.

The majority apparently tries to avoid reliance on this stereotype by characterizing the governmental interest as a "demonstrated opportunity" for a relationship and attempting to close the gap between opportunity and reality with a dubious claim about what is "almost axiomatic." But the fact that one route is wisely forgone does not mean that the other is plausibly taken. The inescapable conclusion instead is that § 1409(a)(4) lacks an exceedingly persuasive justification.

In denying petitioner's claim that § 1409(a)(4) rests on stereotypes, the majority articulates a misshapen notion of "stereotype" and its significance in our equal protection jurisprudence. The majority asserts that a "stereotype" is "defined as a frame of mind resulting from irrational or uncritical analysis." *Ante,* at 68. This Court has long recognized, however, that an impermissible stereotype may enjoy empirical support and thus be in a sense "rational." See, *e. g., J. E. B., supra,* at 139, n. 11 ("We have made abundantly clear in past cases that gender classifications that rest on impermissible stereotypes violate the Equal Protection

Clause, even when some statistical support can be conjured up for the generalization"); *Craig*, 429 U. S., at 201 (invalidating a sex-based classification even though the evidence supporting the distinction was "not trivial in a statistical sense"); *id.*, at 202 (noting that "prior cases have consistently rejected the use of sex as a decisionmaking factor even though the statutes in question certainly rested on far more predictive empirical relationships than this"); *Wiesenfeld*, 420 U. S., at 645 (invalidating a sex-based classification even though the underlying generalization was "not entirely without empirical support"). Indeed, the stereotypes that underlie a sex-based classification "may hold true for many, even most, individuals." *Miller*, 523 U. S., at 460 (GINSBURG, J., dissenting). But in numerous cases where a measure of truth has inhered in the generalization, "the Court has rejected official actions that classify unnecessarily and overbroadly by gender when more accurate and impartial functional lines can be drawn." *Ibid.*

Nor do stereotypes consist only of those overbroad generalizations that the reviewing court considers to "show disrespect" for a class, *ante*, at 73. Cf., *e. g.*, *Craig, supra*, at 198–201. The hallmark of a stereotypical sex-based classification under this Court's precedents is not whether the classification is insulting, but whether it "relie[s] upon the simplistic, outdated assumption that gender could be used as a 'proxy for other, more germane bases of classification.'" *Mississippi Univ. for Women, supra*, at 726 (quoting *Craig, supra*, at 198).

It is also important to note that, while our explanations of many decisions invalidating sex-based classifications have pointed to the problems of "stereotypes" and "overbroad generalizations," these explanations certainly do not mean that the burden is on the challenger of the classification to prove legislative reliance on such generalizations. Indeed, an arbitrary distinction between the sexes may rely on no identifiable generalization at all but may simply be a de-

nial of opportunity out of pure caprice. Such a distinction, of course, would nonetheless be a classic equal protection violation. The burden of proving that use of a sex-based classification substantially relates to the achievement of an important governmental interest remains unmistakably and entirely with the classification's defender. See, *e. g.*, *Virginia*, 518 U. S., at 532–533.

## C

The Court has also failed even to acknowledge the "volumes of history" to which "[t]oday's skeptical scrutiny of official action denying rights or opportunities based on sex responds." *Id.*, at 531. The history of sex discrimination in laws governing the transmission of citizenship and with respect to parental responsibilities for children born out of wedlock counsels at least some circumspection in discerning legislative purposes in this context. See generally *Miller*, *supra*, at 460–468 (GINSBURG, J., dissenting).

Section 1409 was first enacted as § 205 of the Nationality Act of 1940, 54 Stat. 1139–1140. The 1940 Act had been proposed by the President, forwarding a report by a specially convened Committee of Advisors, including the Attorney General. The Committee explained to Congress the rationale for § 205, whose sex-based classification remains in effect today:

> "[T]he Department of State has, at least since 1912, uniformly held that an illegitimate child born abroad of an American mother acquires at birth the nationality of the mother, in the absence of legitimation or adjudication establishing the paternity of the child. This ruling is based . . . on the ground that the mother in such case stands in the place of the father. . . . [U]nder American law the mother has a right to custody and control of such a child as against the putative father, and *is bound* to maintain it as its *natural guardian*. This rule seems to be in accord with the old Roman law and

with the laws of Spain and France." To Revise and Codify the Nationality Laws of the United States, Hearings on H. R. 6127 before the House Committee on Immigration and Naturalization, 76th Cong., 1st Sess., 431 (1945) (reprinting Message from the President, Nationality Laws of the United States (1938)) (emphasis added and internal quotation marks and citations omitted).

Section 1409(a)(4) is thus paradigmatic of a historic regime that left women with responsibility, and freed men from responsibility, for nonmarital children. Under this law, as one advocate explained to Congress in a 1932 plea for a sex-neutral citizenship law, "when it comes to the illegitimate child, which is a great burden, then the mother is the only recognized parent, and the father is put safely in the background." Naturalization and Citizenship Status of Certain Children of Mothers Who Are Citizens of the United States, Hearing on H. R. 5489 before the House Committee on Immigration and Naturalization, 72d Cong., 1st Sess., 3 (testimony of Burnita Shelton Matthews); see also id., at 5 (citizenship law "permit[s] [the father] to escape the burdens incident to illegitimate parenthood"). Unlike § 1409(a)(4), our States' child custody and support laws no longer assume that mothers alone are "bound" to serve as "natural guardians" of nonmarital children. See, e. g., Ariz. Rev. Stat. Ann. § 25–501 (1999) (equal duties of support); cf. Cal. Civ. Code Ann. § 4600 (West 1972) (abolishing "tender years" doctrine). The majority, however, rather than confronting the stereotypical notion that mothers must care for these children and fathers may ignore them, quietly condones the "very stereotype the law condemns," J. E. B., 511 U. S., at 138 (internal quotation marks omitted).

Punctuating the disparity between the majority's and the INS' accounts of the governmental interests at stake is the majority's failure even to address the INS' second asserted rationale: that § 1409 prevents certain children from being stateless. Brief for Respondent 11; see also id., at 17–18

(describing statelessness problem). The Court certainly has good reason to reject this asserted rationale. Indeed, the INS hardly even attempts to show how the statelessness concern justifies the discriminatory means of § 1409(a)(4) in particular. The INS instead undertakes a demonstration of how the statelessness concern justifies § 1409(c)'s relaxed residency requirements for citizen mothers. See *id.*, at 17–19, 42–43, 44, n. 23. But petitioners do not challenge here the distinction between § 1401(g), which requires that citizen fathers have previously resided in the United States for five years, including at least two years after the age of 14, and § 1409(c), which provides that a citizen mother need only have resided in the United States for one year. The INS' proffered justification of statelessness thus does nothing to buttress the case for § 1409(a)(4).

The Court also makes a number of observations that tend, on the whole, to detract and distract from the relevant equal protection inquiry. For example, presumably referring to § 1409 in general, the majority suggests that "the statute simply ensures equivalence between two expectant mothers who are citizens abroad if one chooses to reenter for the child's birth and the other chooses not to return, or does not have the means to do so." *Ante,* at 61. But even apart from the question whether this was one of Congress' actual purposes (and the majority does not affirmatively claim that it was), this equivalence is quite beside the point of petitioners' constitutional challenge, which is directed at the dissimilar treatment accorded to fathers and mothers.

The Court also states that the obligation imposed by § 1409(a)(4) is "minimal" and does not present "inordinate and unnecessary hurdles" to the acquisition of citizenship by the nonmarital child of a citizen father. *Ante,* at 70. Even assuming that the burden is minimal (and the question whether the hurdle is "unnecessary" is quite different in kind from the question whether it is burdensome), it is well settled that "the 'absence of an insurmountable barrier' will not

redeem an otherwise unconstitutionally discriminatory law." *Kirchberg*, 450 U. S., at 461 (quoting *Trimble v. Gordon*, 430 U. S. 762, 774 (1977)).

Finally, while the recitation of statistics concerning military personnel and overseas travel, *ante*, at 65–66, highlights the opportunities for United States citizens to interact with citizens of foreign countries, it bears little on the question whether § 1409(a)(4)'s *discriminatory means* are a permissible governmental response to those circumstances. Indeed, the majority's discussion may itself simply reflect the stereotype of male irresponsibility that is no more a basis for the validity of the classification than are stereotypes about the "traditional" behavior patterns of women.

It is, of course, true that the failure to recognize relevant differences is out of line with the command of equal protection. See *ante*, at 73. But so too do we undermine the promise of equal protection when we try to make our differences carry weight they simply cannot bear. This promise informs the proper application of heightened scrutiny to sex-based classifications and demands our scrupulous adherence to that test.

### III

The Court identifies two "additional obstacles" that petitioners would face even were the Court to accept the conclusion that the statute fails heightened scrutiny. *Ante*, at 71. The first question concerns "'potential problems with fashioning a remedy.'" *Ante*, at 72 (quoting *Miller*, 523 U. S., at 451 (O'CONNOR, J., concurring in judgment) (citing *id.*, at 452–459 (SCALIA, J., concurring in judgment))). The second question concerns "the implications of statements in our earlier cases regarding the wide deference afforded to Congress in the exercise of its immigration and naturalization power." *Ante*, at 72–73. I believe that petitioners are able to surmount both of these hurdles.

As to the matter of remedy, severance of § 1409(a)(4) would have been appropriate had petitioners prevailed. Several

factors support this conclusion. The Immigration and Nationality Act (INA) contains a general severability clause, which provides: "If any particular provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act and the application of such provision to other persons or circumstances shall not be affected thereby." §406, 66 Stat. 281; see note following 8 U. S. C. §1101, p. 38, "Separability." We have concluded that this severability clause "is unambiguous and gives rise to a presumption that Congress did not intend the validity of the [INA] as a whole, or any part of the [INA], to depend upon whether" any one provision was unconstitutional. *INS* v. *Chadha,* 462 U. S. 919, 932 (1983).

Title 8 U. S. C. §1421(d), which states that "[a] person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter and not otherwise," has no effect on the operation of the INA's general severability clause in this case. Section 1421(d) governs only naturalization, which the statute defines as "the conferring of nationality of a state upon a person after birth," §1101(a)(23), whereas §§1401(g) and 1409 deal with the transmission of citizenship at birth, see §1401 ("The following shall be nationals and citizens of the United States at birth . . ."). Further, unlike the INA's general severability clause, §1421(d) does not specifically address the scenario where a particular provision is held invalid. Indeed, the INS does not even rely on §1421(d) in its brief.

Nor does our decision in *INS* v. *Pangilinan,* 486 U. S. 875 (1988), preclude severance here. In *Pangilinan,* this Court held that courts lack equitable authority to order the naturalization of persons who did not satisfy the statutory requirements for naturalization. *Id.,* at 883–885. Petitioners in the instant case, however, seek the exercise of no such equitable power. Petitioners instead seek severance of the offending provisions so that the statute, free of its constitutional defect, can operate to determine whether citizen-

ship was transmitted at birth. Cf. *Miller, supra,* at 488–489 (BREYER, J., dissenting).

In addition to the severance clause, this Court has often concluded that, in the absence of legislative direction *not* to sever the infirm provision, "extension, rather than nullification," of a benefit is more faithful to the legislative design. *Califano* v. *Westcott,* 443 U. S. 76, 89–90 (1979); see also *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975); *Frontiero,* 411 U. S., at 691, n. 25. The choice of extension over nullification also would have the virtue of avoiding injury to parties who are not represented in the instant litigation. And Congress, of course, remains free to redesign the statute in a manner that comports with the Constitution.

As to the question of deference, the pivotal case is *Fiallo* v. *Bell,* 430 U. S. 787 (1977). *Fiallo,* however, is readily distinguished. *Fiallo* involved constitutional challenges to various statutory distinctions, including a classification based on the sex of a United States citizen or lawful permanent resident, that determined the availability of a special immigration preference to certain aliens by virtue of their relationship with the citizen or lawful permanent resident. *Id.,* at 788–792; see also *Miller, supra,* at 429 (opinion of STEVENS, J.). The Court, emphasizing "the limited scope of judicial inquiry into immigration legislation," 430 U. S., at 792, rejected the constitutional challenges. The Court noted its repeated prior emphasis that "'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Ibid.* (quoting *Oceanic Steam Nav. Co.* v. *Stranahan,* 214 U. S. 320, 339 (1909)).

The instant case is not about the admission of aliens but instead concerns the logically prior question whether an individual is a citizen in the first place. A predicate for application of the deference commanded by *Fiallo* is that the individuals concerned be aliens. But whether that predicate obtains is the very matter at issue in this case. Cf. *Miller,*

523 U. S., at 433, n. 10 (opinion of STEVENS, J.) ("[T]he Government now argues . . . that an alien outside the territory of the United States has no substantive rights cognizable under the Fifth Amendment. Even if that is so, the question to be decided is whether petitioner is such an alien or whether, as [petitioner] claims, [petitioner] is a citizen. Thus, we must address the merits to determine whether the predicate for this argument is accurate" (internal quotation marks and citation omitted)). Because §§ 1401 and 1409 govern the conferral of citizenship at birth, and not the admission of aliens, the ordinary standards of equal protection review apply. See *id.*, at 480–481 (BREYER, J., dissenting).

\*　　\*　　\*

No one should mistake the majority's analysis for a careful application of this Court's equal protection jurisprudence concerning sex-based classifications. Today's decision instead represents a deviation from a line of cases in which we have vigilantly applied heightened scrutiny to such classifications to determine whether a constitutional violation has occurred. I trust that the depth and vitality of these precedents will ensure that today's error remains an aberration. I respectfully dissent.