RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0030P (6th Cir.)
File Name:  02a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHLAND BOOKMART, INC.,
d/b/a TOWN AND COUNTRY,
   *Plaintiff-Appellant,*

   *v.*

RANDALL E. NICHOLS,
   *Defendant-Appellee.*

No. 00-5563

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 95-00349—R. Leon Jordan, District Judge.

Argued:  August 3, 2001

Decided and Filed:  January 23, 2002

Before:  CLAY and GILMAN, Circuit Judges; WISEMAN,
Senior District Judge.

_____

*The Honorable Thomas A. Wiseman, Jr., Senior United States
District Judge for the Middle District of Tennessee, sitting by designation.

1

—————————————

**COUNSEL**

**ARGUED:** Frierson M. Graves, Jr., BAKER, DONELSON, BEARMAN & CALDWELL, Memphis, Tennessee, for Appellant. Steven A. Hart, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Frierson M. Graves, Jr., BAKER, DONELSON, BEARMAN & CALDWELL, Memphis, Tennessee, for Appellant. Steven A. Hart, Michael J. Fahey II, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

GILMAN, J., delivered the opinion of the court, in which WISEMAN, D. J., joined. CLAY, J. (pp. 14-19), delivered a separate dissenting opinion.

—————————————

**OPINION**

—————————————

RONALD LEE GILMAN, Circuit Judge. In 1995, Richland Bookmart, Inc. (Bookmart), the operator of an adult-oriented video and book store, brought suit against Randall E. Nichols, the District Attorney for Knox County, Tennessee, challenging Tennessee's Adult-Oriented Establishments Act of 1995 (the Act) on the grounds that it violated both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The Act requires that all adult-oriented establishments be closed on Sundays and state holidays, restricts the hours of operation for certain of these establishments, and mandates that all of them remove doors or other obstructions from the booths in which patrons watch sexually-explicit videos or live entertainment.

Concluding that the operating-hour restrictions violated the First Amendment and that the Act was unconstitutionally vague and overbroad, the district court issued a permanent

For the above-stated reasons, I would hold the Act unconstitutional, and therefore respectfully dissent.[2]

_____

[2]I would find the entire Act unconstitutional inasmuch as the Act lacks a severability clause. *See State ex rel. Barker v. Harmon*, 882 S.W.2d 352, 355 (Tenn. 1994) (noting that the doctrine of elision is not favored in Tennessee, and that without the inclusion of a severability clause in the statute, severability of the invalid portion of a statute in order to allow the remainder to survive is not proper).

cabarets are the same cannot be summarily dismissed by the majority's speculation that the Tennessee legislature "apparently" differentiated between the two types of establishments not on the content of their expression, but on the medium of their expression, "simply because the legislature had dealt with the secondary effects of live cabarets the year before and turned to bookstores the following year." In support of this conclusion, the majority relies upon a case from the Ninth Circuit, *Ripplinger v. Collins*, 868 F.2d 1043 (9th Cir. 1989). It is true, as the majority contends, that the Ninth Circuit found that Arizona's obscenity statute, which provided an exemption for cable television operators but not booksellers, did not violate the Equal Protection Clause under a rational basis standard of review. However, the Ninth Circuit did so, in part, on the "[v]alid distinctions between cable and other broadcasting." *See id.* at 1051. Specifically, the court noted that the Arizona legislature "may have determined that . . . cable television is less pervasive and extreme in its sexual content." *Id.* Here, unlike in *Ripplinger*, there are no distinctions between the expressive content nor the secondary effects of the regulated bookstores and the nonregulated live cabarets.

The underinclusiveness of a regulation may fall afoul of the Equal Protection Clause rendering the regulation unconstitutional. *See DLS*, *Inc.*, 107 F.3d at 411. Because the dangers posed by live cabarets not only carry the specter of dangers the Act seeks to prevent, but in fact may carry with them a greater likelihood of these dangers, I would hold the Act unconstitutional as underinclusive. The majority's contention that this conclusion cannot be reached where the content of the speech is virtually identical, fails to consider the significance of when the secondary effects of each are also virtually identical as espoused by this Court in *DLS*.

injunction to enjoin enforcement of the Act. On appeal, this court reversed the district court's conclusion that the Act violated the First Amendment, and remanded the case for further proceedings to consider Bookmart's equal protection argument under the Fourteenth Amendment. *See Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435 (6th Cir. 1998) (*Bookmart I*).

Both parties subsequently filed motions for summary judgment. In denying Bookmart's equal protection challenge, the district court concluded that the exclusion of live-entertainment establishments from the time restrictions of the Act was rationally related to Tennessee's legitimate interest in combating the harmful secondary effects of such establishments through a step-by-step legislative reform effort. Bookmart now challenges that ruling. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Factual background

Bookmart operates a video and book store in Knoxville, Tennessee. Restricting access to adults only, it sells, rents, and distributes sexually oriented books, magazines, and videos. The videos are for off-premises viewing only.

In May of 1995, the Tennessee legislature passed the Adult-Oriented Establishments Act of 1995, Tenn. Code Ann. § 7-51-1401. The Act defines an "adult-oriented establishment" as "any commercial establishment, business or service, or portion thereof, which offers, as its principal or predominant stock or trade, sexually oriented material, devices, or paraphernalia or specified sexual activities, or any combination or form thereof, whether printed, filmed, recorded or live and which restricts or purports to restrict admission to adults or to any class of adults." Such establishments include adult bookstores, adult motion picture theaters, and adult live entertainment.

Section 3 of the Act limits the business hours for adult-oriented establishments to between 8:00 a.m. and 12:00 a.m., Monday through Saturday. It also prohibits all such establishments from operating on Sundays and state legal holidays. Section 4 of the Act regulates the configuration of private booths, stalls, or partitioned rooms in order to prevent their use for sexual activity. Because Bookmart has no private booths, this provision of the Act is not at issue. Section 5 of the Act sets out the criminal penalties, making any violation a misdemeanor.

The basis for Bookmart's equal protection challenge is found in Section 6 of the Act. Here, the Act specifically exempts adult-oriented establishments offering "only live, stage adult entertainment in a theatre, adult cabaret, or dinner show type setting" (collectively "live cabarets") from its "opening and closing time limitations." Bookmart maintains that the Act, therefore, classifies similarly situated adult-oriented establishments differently.

Anticipating constitutional challenges, the Tennessee legislature held significant hearings and included a lengthy preamble in the Act. The Act's preamble and legislative history make clear that the legislature promulgated the Act in order to address certain adverse secondary effects commonly associated with adult-oriented establishments. These secondary effects include increased crime and prostitution, reduced property values, urban blight, the spread of sexually transmitted and communicable diseases, and an overall downturn in the quality of life.

Because the Tennessee legislature focused its attention on potential First Amendment challenges to the Act, there are few references in the legislative history to equal protection or to the rationale supporting the operating-hour exemption for live cabarets provided in Section 6. In the prior year, however, the legislature had passed Tennessee's Public Indecency Act, Tenn. Code Ann. § 39-13-511, making it a misdemeanor offense to knowingly or intentionally appear in public in a "state of nudity." To comply with the indecency

underinclusive and therefore run afoul of the Constitution when the secondary effects of a regulated activity and those of an unregulated similar activity are indistinguishable – by couching the *DLS* directive as "a single clause." The force of a directive cannot be minimized by the brevity of its grammatical characterization. Indeed, the First Amendment itself is a "*single*" sentence upon which the jurisprudence of our country is deeply committed to every "*clause*" therein. *See Bonnell v. Lorenzo*, 241 F.3d 800, 827 (6th Cir. 2001) ("[W]e hope that whenever we decide to tolerate intolerant speech, the speaker as well as the audience will understand that we do so to express our deep commitment to the value of tolerance -- a value protected by every clause in the single sentence called the First Amendment . . . .") (quoting Edward J. Cleary, Beyond the Burning Cross 198 (1995) (quoting speech of Justice Stevens)). In addition, the force of the "single clause" directive in *DLS* cannot be swept aside as the majority attempts to do by rendering the directive some sort of "bolstering" device, or by simply looking to the expressive content of the two activities involved. To do so negates the very characteristic which this Court found outcome determinative in *DLS*; namely, that the secondary effects between the regulated and the nonregulated establishments were different.

Similarly, the force of the *DLS* directive cannot be minimized by the majority's claim that it is a mere "inference" that I have drawn from the case. The majority contends that such an "inference" is "inconsistent with the uncontested fact that the expressive content of the live cabarets and adult bookstores is virtually identical." As noted, the *DLS* directive that an ordinance may be considered content based when the expressive content as well as the secondary effects of the two establishments are the same, is a premise – not an inference, that this Court found so significant that the case turned on the fact that the secondary effects between the two establishments there were different.

Along this line, the significant fact that the secondary effects of the regulated bookstores and unregulated live

downturn in the quality of life – are any less of a concern with live adult cabarets than with the adult bookstores, thereby making this case distinguishable from *DLS*. Indeed, when asked at oral argument as to why these secondary concerns are not present with live cabarets, Defendant offered no response. Common sense would seem to dictate that, if anything, the secondary effects would be *more* of a concern with live cabarets inasmuch as unlike the instance with adult bookstores where patrons purchase sexually explicit material for use or viewing at some location away from the store itself, patrons of live cabarets are viewing and experiencing the sexually explicit material at that location, thereby making it more likely that the patron would have sexual contact with an entertainer, or to engage in lewd acts in the surrounding area. In fact, the Supreme Court has found constitutional an Indiana state ordinance requiring otherwise nude dancers to wear pasties and G-strings, recognizing that the ordinance was enacted to protect the public from harmful secondary effects of such live nude establishments. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569-70 (1991).

Because the nonregulated live cabarets of the kind involved here raise the same specter of secondary effects associated with the regulated adult bookstores, it should be concluded that the Tennessee legislature "in fact made an impermissible distinction on the basis of the content of the regulated speech." *DLS, Inc.,* 107 F.3d at 411 (finding that because "none of the items in [the laundry list of unregulated activities] carries with it the same danger of crime and disease that the [regulated activities] do[,]" the ordinance was not impermissibly content based). In other words, this Court has guided us with the directive that where the expressive content of a regulated and a nonregulated activity are the same, we must look to secondary effects of the two activities or establishments to determine the content neutrality of the ordinance. *Id.* Where no differences can be drawn, a conclusion of constitutional infirmity may be reached. *Id.*

The majority attempts to diminish the force of this Court's directive in *DLS* – that a regulation may be considered

statute, performers at the live cabarets have to wear, at a minimum, "pasties" and a "G-string."

The indecency statute, like the Act before us, was enacted to further the state's interest in combating the harmful secondary effects associated with adult-oriented establishments. Its preamble states that "nude dancing establishments, because of their very nature, have a deleterious effect on both the existing businesses around them and the surrounding residential areas adjacent to them, causing increased crime and the downgrading of property values" and "contributing to urban blight and downgrading the quality of life in the adjacent area."

Before the indecency law went into effect in July of 1994, multiple owners and operators of nude dancing establishments brought suit, challenging the law's constitutionality under the First Amendment. Enforcement of the law was stayed pending the outcome of these lawsuits. In January of 1999, this court upheld the Public Indecency Act, concluding that its enforcement does not violate the First Amendment's guarantee of freedom of expression. *See In re: Tennessee Pub. Indecency Statute,* Nos. 96-6512, 96-6573, 97-5924, 97-5938, 1999 WL 55276, at *3 (6th Cir. Jan. 13, 1999) (unpublished table decision). Because of the delay in implementation caused by the pending litigation, the Tennessee legislature was not able to assess the Public Indecency Act's efficacy in combating the secondary effects associated with nude dancing establishments when it was considering the Adult-Oriented Establishments Act in 1995.

## B.   Procedural history

One month after the Adult-Oriented Establishments Act was passed, Bookmart initiated suit, seeking to enjoin its enforcement as a violation of both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The district court concluded that the Act's operating-hour restrictions violated the First Amendment, and that the Act was unconstitutional in its overbreadth and vagueness. It therefore issued a preliminary injunction that was later made

permanent. The district court, however, never reached the equal protection issue raised in Bookmart's complaint.

This court reversed the district court on appeal and upheld the Act as constitutional under the First Amendment. The court reasoned:

> [S]uch regulation of hours of shops selling sex literature would tend to deter prostitution in the neighborhood at night or the creation of drug "corners" on the surrounding streets. By deterring such behavior, the neighborhood may be able to ward off high vacancy rates, deteriorating store fronts, a blighted appearance and the lowering of the property values of homes and shopping areas. Such regulation may prevent the bombed-out, boarded-up look of areas invaded by such establishments.

*Bookmart I*, 137 F.3d at 440-41. It therefore vacated the permanent injunction and remanded the case to the district court for further proceedings on Bookmart's equal protection challenge to the Act's exemption of live cabarets from the operating-hour restrictions.

On remand, Bookmart moved for a preliminary injunction and for summary judgment. The District Attorney opposed Bookmart's motions and filed his own motion for judgment on the pleadings or, in the alternative, summary judgment. Because both parties agreed at a status conference to maintain the status quo, the district court denied as moot Bookmart's motion for a preliminary injunction.

The district court granted the District Attorney's motion for summary judgment on March 31, 2000. The court rejected Bookmart's equal protection challenge, finding that the Tennessee legislature had rationally chosen to mount a step-by-step approach in its efforts to ameliorate the secondary effects of adult-oriented establishments. Bookmart now brings the instant appeal.

that feature employees who expose their breasts, buttocks, or genitals to public view, and 'adult bookstores,' or bookstores that also offer films or live entertainment that depict certain defined 'sexual activities' or 'anatomical areas.'" *Id.* After a series of amendments and constitutional challenges, the amended ordinance was challenged with respect to the provision that "prohibit[ed] entertainers from approaching within six feet of customers, employees, or other entertainers during a performance . . . ." *Id.* In the course of making their argument that the provision violated the First Amendment, the plaintiffs claimed that the provision was not content neutral because it did not regulate similar activities.[1] *Id.* In other words, the plaintiffs argued that the provision was unconstitutional because it was underinclusive. *Id.*

This Court then recognized that "in some rare cases, the underinclusiveness of a law – i.e., the failure of the government to regulate other, similar activity – may give rise to a conclusion that the government has in fact made an impermissible distinction on the basis of the content of the regulated speech." *DLS, Inc.*, 107 F.3d at 411. In finding that the matter before it was "not one of those cases[,]" the Court noted that "[t]he expressive content of the items in plaintiffs' laundry list of unregulated transactions is virtually identical to that of erotic dancing; *however, none of the items carries with it the same danger of crime and disease that the adult cabarets do*." *Id.* (emphasis added).

Here, on the other hand, Defendants have offered nothing to indicate that the purported secondary effects that the Act was designed to prevent – increased crime and prostitution, reduced property values, urban blight, the spread of sexually transmitted and communicable diseases, and an overall

---

[1] The plaintiffs actually styled their argument in this regard as a challenge to the ordinance under the Equal Protection Clause; however, the Court noted that in such cases, if a sufficient rationale exists for the ordinance under the First Amendment, then a rational basis exists for the alleged disparate treatment under the Equal Protection Clause. *See DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 412 n.7 (6th Cir. 1997).

---

### DISSENT

---

CLAY, Circuit Judge, dissenting. Because I would find the Act unconstitutional under the Equal Protection Clause due to its underinclusiveness, I respectfully dissent. The harmful secondary effects the Act was designed to prevent are just as likely, if not more likely, with the nonregulated live cabarets as they are with the regulated adult bookstores. Thus, the Acts's exemption of the live cabarets from its operating-hour restrictions leads to the conclusion that the Tennessee legislature has made an impermissible distinction on the basis of the content of the regulated speech.

"[T]he notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in First Amendment principles." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (emphasis in original). Indeed, this Court has recognized that "in some cases, the underinclusiveness of a law – i.e., the failure of the government to regulate other, similar activity – may give rise to a conclusion that the government has in fact made an impermissible distinction on the basis of the content of the regulated speech." *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 411 (6th Cir. 1997). The *DLS* Court was not persuaded that the city ordinance in question was "one of those cases[;]" however, the Court's reasoning in arriving at that conclusion is illustrative in demonstrating why the Act in the matter at hand is one of those cases. *See id.*

*DLS* involved a challenge brought by a corporate owner and employees of a night club devoted to erotic dancing to a Chattanooga City Ordinance that regulated adult-oriented establishments, on the grounds that the ordinance was unconstitutional. *See DLS, Inc.*, 107 F.3d at 405. The City of Chattanooga originally enacted the ordinance in 1986 "to regulate 'adult-oriented establishments,' which were defined to include, *inter alia*, both 'adult cabarets,' or public facilities

## II. ANALYSIS

### A. Level of scrutiny

The Equal Protection Clause protects against arbitrary classifications, and requires that similarly situated persons be treated equally. *See* U.S. Const. Amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To withstand Fourteenth Amendment scrutiny, statutes that do not interfere with fundamental rights or single out suspect classifications must bear only a rational relationship to a legitimate state interest. *See City of Cleburne*, 473 U.S. at 440.

Because adult-bookstore owners are obviously not a suspect class entitled to heightened protection, the remaining question for determining the proper level of scrutiny is whether the Act's operating-hour restrictions implicate any fundamental right. Bookmart contends that the Act should be subject to strict scrutiny analysis because it burdens the fundamental rights associated with freedom of expression and is a content-based regulation in violation of the First Amendment. The District Attorney, on the other hand, maintains that we need apply only the rational basis test in our analysis.

In upholding the constitutionality of the statute under the First Amendment in *Bookmart I*, this court concluded that because the Act targeted the secondary effects of adult-oriented establishments rather than their expressive content, it was to be treated as content-neutral as between sexually-explicit and non-sexually explicit speech. *Bookmart I*, however, did not reach the question of whether the Act discriminates between different types of adult establishments based upon the content of their expression. The finding of content-neutrality, therefore, does not foreclose Bookmart's argument that its equal protection claim implicates fundamental First Amendment rights.

According to Bookmart, the Act is underinclusive in a way that reveals its intentional content-based discrimination against adult bookstores versus live cabarets. The

underinclusiveness of a law will violate the First Amendment where the proof establishes that the statute in question is intended to restrict disfavored expressive content while exempting the expression of favored content. *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (holding that an exemption might violate the First Amendment if it represents "a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people"). Although in some cases the First Amendment is violated because "the underinclusiveness of a law—i.e., the failure of the government to regulate other, similar activity—may give rise to a conclusion that the government has in fact made an impermissible distinction on the basis of the content of the regulated speech," such a conclusion is not possible where the content of the differently regulated speech is "virtually identical." *DLS v. City of Chattanooga*, 107 F.3d 403, 412 n.7 (6th Cir. 1997) (holding, in rejecting a similar underinclusiveness challenge, that a statute regulating live cabarets differently than other forms of adult entertainment was not content-based because the content of the differently regulated modes of expression was "virtually identical").

Bookmart's equal protection claim does not implicate fundamental First Amendment rights because Bookmart offers no evidence that the expressive content of live cabarets is different in any meaningful respect from that of the adult bookstores subject to the operating-hour restrictions imposed by the Act. Because the expressive content of the regulated live cabarets is "virtually identical" to that of adult bookstores, the statute cannot be said to discriminate against the expressive content of the bookstores and in favor of that of the live cabarets. *DLS*, 107 F.3d at 411.

To support the argument that we should infer content-based discrimination from the fact that the secondary effects of the live cabarets and adult bookstores are the same, the dissent relies upon a single clause found in *DLS* to the effect that none of the unregulated activities identified by DLS "carries with it the same danger of crime and disease that adult cabarets do." *Id.* at 411. Unlike the dissent, however, we do

reasonable opportunity to experiment with solutions to admittedly serious problems" in regulating adult movie theaters, book stores, and similar establishments); *see also McGowan v. Maryland*, 366 U.S. 420, 536 (1961) ("That more or fewer activities than fall within the exceptions could with equal rationality have been excluded from the general ban does not make irrational the selection which has actually been made.") (Frankfurter, J. concurring).

The Tennessee legislature arrived at a plausible step-by-step approach to addressing these risks. This is the kind of judgment that is committed to state and federal legislatures rather than to the courts. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("In short, the judiciary is not to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."). Given the overwhelming precedent upholding legislative step-by-step reform efforts and the lack of any invidious discrimination in exempting live cabarets from the Act's operating-hour provisions, we hold that the Act bears a rational relation to a legitimate governmental purpose, and therefore does not violate the Equal Protection Clause.

Bookmart's final argument is that the entire Act must be declared unconstitutional if any part is held invalid. It claims that because the Act lacks a severability clause, the provisions regarding viewing-booth configurations must also be struck down. Given our conclusion that the Act does not violate the Equal Protection Clause, however, we need not address Bookmart's argument concerning whether the provisions of the Act are severable.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

(1954)) (brackets in original). In the present case, Bookmart does not even allege, much less attempt to prove, such an invidious intent on the part of the Tennessee legislature in its exemption of live cabarets from the operating-hour restrictions of the Act.

This leaves Bookmart with the argument that the Act's "underinclusiveness" constitutes content-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. But as we have discussed above in determining the proper level of scrutiny, an inference of content-based discrimination is inconsistent with the uncontroverted fact that the expressive content of live cabarets is virtually identical to that of adult bookstores. *DLS*, 107 F.3d at 411.

We conclude that the history behind the Act's passage, and the virtually identical expressive content as between live adult cabarets and adult bookstores, belies the notion that the Tennessee legislature made an impermissible distinction on the basis of content or that the operating-hours exemption of the live cabarets was invidious. This court has determined that "[a] state legislature may implement its program of reform by gradually adopting regulations that only partially ameliorate a perceived evil." *In re Grand Jury Proceedings*, 810 F.2d 580, 588 (6th Cir. 1987).

The District Attorney in fact argues that the legislature decided to exclude live cabarets from the operating-hour provisions of the Act simply because of the legislative efforts the year before that were aimed at combating the secondary effects associated with public nudity. Although the Act did not go as far as it might due to its exemption of live cabarets from the operating-hour restrictions placed on the regulated businesses, this does not make the Act unconstitutional. *See Roschen v. Ward*, 279 U.S. 337, 339 (1929) ("A statute is not invalid under the Constitution because it might have gone farther than it did."). Moreover, the legislature may select one phase of one field and apply a remedy there, neglecting the others. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976) (holding that Detroit "must be allowed a

not believe that the outcome in *DLS* turned on this point, nor do we believe that the absence of such a distinction absolves Bookmart from its burden of proving invidious discrimination as discussed in Part B below.

This court in *DLS* considered an underinclusiveness claim similar to the one raised by Bookmart. At issue was a city ordinance prohibiting entertainers at adult-oriented establishments from approaching within six feet of customers, employees, or other entertainers during a performance. The ordinance was upheld despite the city's failure to apply any comparable restrictions to speech with "virtually identical" expressive content, such as nudity on cable television. *DLS*, 107 F.3d at 411. As the dissent points out, the *DLS* court noted that the state's "secondary effects" rationale for the statute's disparate treatment of live cabarets versus adult cable television was supported by the fact that the content of the two forms of expression was the same, but the secondary effects were different. *DLS*, 107 F.3d at 411.

In the present case, the state's non-discriminatory rationale in support of the Act's operating-hour restrictions would indeed be bolstered if, as in *DLS*, the disparate treatment of adult cabarets and adult bookstores could be ascribed directly to a difference in the secondary effects of the two types of establishments. The fact that the secondary effects are the same, however, does not *ipso facto* establish that the difference in treatment is the result of content-based discrimination. Instead, the Tennessee legislature apparently differentiated between the various adult-oriented establishments based on their *medium* of expression rather than the *content* of their expression simply because the legislature had dealt with the secondary effects of live cabarets the year before and turned to bookstores the following year. *See Ripplinger v. Collins*, 868 F.2d 1043, 1050-51 (9th Cir. 1989) (holding that Arizona's obscenity statute, which provided an exemption for cable television operators but not booksellers, did not violate the Equal Protection Clause). We therefore disagree with the inference that the dissent draws from the *DLS* case to the effect that

where the secondary effects of two types of differently regulated adult entertainment are the same, it follows that the statute discriminates based upon expressive content. Such an inference is inconsistent with the uncontested fact that the expressive content of the live cabarets and adult bookstores is virtually identical.

The Act will therefore survive an equal protection challenge if it has a rational basis. Under the rational basis standard, a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Nguyen v. I.N.S.*, 121 S. Ct. 2053, 2068 (2001).

**B.  The Act is rationally related to a legitimate governmental interest**

The essence of Bookmart's equal protection claim is that the Act should be held unconstitutional because it is underinclusive. Bookmart claims that the Act's exemption of live cabarets from these restrictions is irrational because the Tennessee legislature determined that the secondary effects of live cabarets are indistinguishable from those of adult bookstores.  This being the case, the legislative goal of combating the harmful secondary effects of adult-oriented establishments cannot explain the difference in treatment between adult cabarets and adult bookstores.

The problem with this argument, however, is that an exemption will rarely, if ever, invalidate a statute, unless the distinction created by the exemption is the result of invidious discrimination. *See Kucharek v. Hanaway*, 902 F.2d 513, 520 (7th Cir. 1990) ("The existence of an exemption will rarely if ever invalidate a statute unless the distinction created by it is invidious—say a head tax from which Christians are exempt.").

As the Supreme Court explained in *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483 (1955):

The problem of legislative classification is a perennial one, admitting of no doctrinaire definition.  Evils in the same field may be of different dimensions and proportions, requiring different remedies.  Or so the legislature may think.  Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.  The legislature may select one phase of one field and apply a remedy there, neglecting the others.  The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.

*Id.* at 489 (internal citations omitted).

The Supreme Court has determined that invidiousness is present when a legislature is motivated by a discriminatory or impermissible intent when creating the challenged classification. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 276-80 (1979) (rejecting an equal protection challenge to the state's hiring preference for veterans because there was no finding that the law's purpose was to intentionally discriminate against women); *Washington v. Davis*, 426 U.S. 229, 238-48 (1976) (holding that the police department's written personnel test did not run afoul of the Equal Protection Clause despite its racially disproportionate impact because the requirement was not prompted by an invidious motive); *cf. Griffin v. Illinois*, 351 U.S. 12, 18-19 (1956) (holding that the de facto denial of appeal rights by an Illinois statute that required payment for a trial transcript denied equal protection to indigents because it invidiously discriminated among defendants based upon their wealth).

In *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993), the Court elaborated on the meaning of "invidious discrimination" by looking at the definition and the context in which it was used in *Griffin*.  The Court cited with approval the dictionary definition of the term "invidious" as "[t]ending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating." *Id.* (citing Webster's Second International Dictionary 1306