IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

_____

**KIMBERLY MCLAUGHLIN,**
*Petitioner,*

*v.*

**THE HONORABLE LORI B. JONES, JUDGE PRO TEMPORE OF THE SUPERIOR COURT OF THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF PIMA,**
*Respondent Judge,*

**SUZAN MCLAUGHLIN,**
Real Party in Interest.

_____

No. CV-16-0266-PR
Filed September 19, 2017

_____

Appeal from the Superior Court in Pima County
The Honorable Lori B. Jones, Judge Pro Tempore
No. DC20130015
**AFFIRMED**

Opinion of the Court of Appeals, Division Two
240 Ariz. 560 (App. 2016)
**VACATED**

_____

COUNSEL:

Keith Berkshire (argued), Erica L. Gadberry, Berkshire Law Office PLLC, Phoenix, Attorneys for Kimberly McLaughlin

Shannon Minter (argued), Emily Haan, Catherine Sakimura, National Center for Lesbian Rights, San Francisco, CA; and Claudia D. Work, Campbell Law Group Chartered, Phoenix, Attorneys for Suzan McLaughlin

Barbara A. Atwood, Professor of Law Emerita, Director, Family and Juvenile Law Certificate Program, Paul D. Bennett, Clinical Professor and Director, Child and Family Law Clinic, Negar Katirai, Director, Community Law Group, and Jason Buckner, Natalie Cafasso, and Chris Lloyd, Rule 38(d) Certified Law Students, Child and Family Law Clinic, The University

of Arizona, Tucson, for Amici Curiae Child and Family Law Clinic, The University of Arizona James E. Rogers College of Law

Leslie Cooper, American Civil Liberties Union Foundation, New York, NY; and Kathleen E. Brody, American Civil Liberties Union Foundation of Arizona, Phoenix, Attorneys for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Arizona

Gregg R. Woodnick, Markus W. Risinger, Woodnick Law PLLC, Phoenix, Attorneys for Amicus Curiae Arizona Family Law Practitioners

---

CHIEF JUSTICE BALES authored the opinion of the Court, in which JUSTICES BRUTINEL and TIMMER and JUDGE JONES joined\*. JUSTICE LOPEZ, joined by VICE CHIEF JUSTICE PELANDER, concurred. JUSTICE BOLICK concurred in part and dissented in part.

---

CHIEF JUSTICE BALES, opinion of the Court:

¶1 Under A.R.S. § 25-814(A)(1), a man is presumed to be a legal parent if his wife gives birth to a child during the marriage. We here consider whether this presumption applies to similarly situated women in same-sex marriages. Because couples in same-sex marriages are constitutionally entitled to the "constellation of benefits the States have linked to marriage," *Obergefell v. Hodges*, 135 S. Ct. 2584, 2601 (2015), we hold that the statutory presumption applies. We further hold that Kimberly McLaughlin, the birth mother here, is equitably estopped from rebutting her spouse Suzan's presumptive parentage of their son.

**I.**

¶2 The facts are not in dispute. In October 2008, Kimberly and Suzan, a same-sex couple, legally married in California. After the couple decided to have a child through artificial insemination, Suzan unsuccessfully attempted to conceive using an anonymous sperm donor. In 2010, Kimberly underwent the same process and became pregnant.

---

\* Justice Andrew W. Gould recused himself. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Kenton D. Jones, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

¶3          During the pregnancy, Kimberly and Suzan moved to Arizona. In February 2011, they entered a joint parenting agreement declaring Suzan a "co-parent" of the child. The agreement specifically states that "Kimberly McLaughlin intends for Suzan McLaughlin to be a second parent to her child, with the same rights, responsibilities, and obligations that a biological parent would have to her child" and that "[s]hould the relationship between [them] end . . . it is the parties [sic] intention that the parenting relationship between Suzan McLaughlin and the child shall continue with shared custody, regular visitation, and child support proportional to custody time and income." Kimberly and Suzan also executed wills declaring Suzan to be an equal parent.

¶4          In June 2011, Kimberly gave birth to a baby boy, E. While Kimberly worked as a physician, Suzan stayed at home to care for E. When E. was almost two years old, Kimberly and Suzan's relationship deteriorated to the point that Kimberly moved out of their home, taking E. and cutting off Suzan's contact with him.

¶5          Consequently, in 2013, Suzan filed petitions for dissolution and for legal decision-making and parenting time in loco parentis. During litigation, Suzan challenged the constitutionality of Arizona's refusal to recognize lawful same-sex marriages performed in other states, and pursuant to A.R.S. § 12-1841, provided notice to the State of her constitutional challenge. The State intervened in the litigation.

¶6          After the Supreme Court held in *Obergefell* that the Fourteenth Amendment to the United States Constitution guarantees same-sex couples the fundamental right to marry, the State withdrew as a party, and the trial court ordered the case to proceed as a dissolution of marriage action with children because Suzan was a presumptive parent under A.R.S. § 25-814(A)(1). Based on *Obergefell*, the court reasoned that it would violate Suzan's Fourteenth Amendment rights not to afford her the same presumption of paternity that applies to a similarly situated man in an opposite-sex marriage. Additionally, the court held that Kimberly could not rebut Suzan's presumptive parentage under A.R.S. § 25-814(C) because permitting rebuttal would allow a biological mother to use the undisputed fact of a consensual, artificial insemination to force the non-biological parent to pay child support under A.R.S. § 25-501(B) while denying that same non-biological parent any parental rights. *See* A.R.S. § 25-501(B) ("A child who is born as the result of artificial insemination is entitled to

support from the mother as prescribed by this section and the mother's spouse if the spouse either is the biological father of the child or agreed in writing to the insemination before or after the insemination occurred.").

¶7        Kimberly sought special action review in the court of appeals. That court accepted jurisdiction but denied Kimberly relief, concluding that, under *Obergefell*, § 25-814(A) applies to same-sex spouses and that Suzan is the presumptive parent. *McLaughlin v. Jones*, 240 Ariz. 560, 564 ¶ 14, 565–66 ¶ 19 (App. 2016). The court also reasoned that Kimberly was equitably estopped from rebutting Suzan's presumption of parentage under § 25-814(C). *Id.* at ¶ 20.

¶8        After the court of appeals issued its decision, another division of the court reached a contrary result in a different case. *See Turner v. Steiner*, 242 Ariz. 494 (App. 2017). A divided panel concluded that a female same-sex spouse could not be presumed a legal parent under § 25-814(A)(1) because the presumption is based on biological differences between men and women and *Obergefell* does not require courts to interpret paternity statutes in a gender-neutral manner. *Id.* at 498–99 ¶¶ 15–18. The dissenting judge argued that *Obergefell* mandates a gender-neutral interpretation of § 25-814(A)(1) and that affording equal rights of parentage would foster, instead of disrupt, the permanency and stability important to a child's best interest. *Id.* at 901 ¶ 25 (Winthrop, J., dissenting).

¶9        We granted review because the application of § 25-814(A)(1) to same-sex marriages after *Obergefell* is a recurring issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

¶10        We review the constitutionality and interpretation of statutes de novo. *State v. Stummer*, 219 Ariz. 137, 141 ¶ 7 (2008). "[T]he words of a statute are to be given their ordinary meaning unless it appears from the context or otherwise that a different meaning is intended." *State v. Miller*, 100 Ariz. 288, 296 (1966).

¶11        Under Arizona law, "[a] man is presumed to be the father of the child if . . . [h]e and the mother of the child were married at any time in the ten months immediately preceding the birth or the child is born within

4

ten months after the marriage is terminated . . . ." A.R.S. § 25-814(A)(1). The "paternity" presumed by this statute, as explained further below, refers to a father's legal parental rights and responsibilities rather than biological paternity. Because Arizona does not have any statutes addressing parental rights—apart from financial obligations under § 25-501(B)—in cases of artificial insemination, a husband in an opposite-sex marriage whose wife is artificially inseminated by an anonymous sperm donor can establish his parental rights through § 25-814(A)(1). Kimberly argues the trial court erred when it applied this marital paternity presumption to Suzan, because the statute by its terms only applies to males and *Obergefell* does not mandate extending the presumption to females.

**A.**

**¶12**　　As Kimberly correctly notes, the text of § 25-814(A)(1) clearly indicates that the legislature intended the marital paternity presumption to apply only to males. In articulating the presumption, the legislature used the words "father," "he," and "man." Although not statutorily defined, all these words refer to the male sex. *See* Black's Law Dictionary (10th ed. 2014) (defining "father" as "[a] male parent" and "man" as "[a]n adult male"). These words are contrasted with words connoting the female sex, such as "mother." *See* Webster's Third New International Dictionary 1474 (2002) (defining "mother" as "a female parent"). By its terms, the statute applies to a "man" who is married to the "mother" within ten months of the child's birth. Section 25-814(A)(1), therefore, applies to husbands in opposite-sex marriages. As written, § 25-814(A)(1) does not apply to Suzan.

**¶13**　　However, in the wake of *Obergefell*, excluding Suzan from the marital paternity presumption violates the Fourteenth Amendment. In *Obergefell*, the United States Supreme Court reiterated that marriage is a fundamental right, long-protected by the Due Process Clause. 135 S. Ct. at 2598. Describing marriage as "a keystone of our social order," the Court noted that states have "made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities," such as "child custody, support, and visitation rules," further contributing to its fundamental character. *Id.* at 2601. Denying same-sex couples "the same legal treatment" in marriage, *id.* at 2602, and "all the benefits" afforded opposite-sex couples, "works a grave and continuing harm" on gays and lesbians in various ways—demeaning them, humiliating and stigmatizing their

5

children and family units, and teaching society that they are inferior in important respects. *Id.* at 2600–02, 2604.

¶14　　　　Denying same-sex couples the right to marry, *Obergefell* concluded, unjustifiably infringes the fundamental right to marry in violation of the Fourteenth Amendment's Due Process and Equal Protection Clauses. *Id.* at 2604. Accordingly, the Court invalidated as unconstitutional state laws banning same-sex marriage "to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Id.* at 2605.

¶15　　　　Despite *Obergefell*'s holding requiring states to provide same-sex couples "the same terms and conditions" of marriage, Kimberly urges this Court to interpret *Obergefell* narrowly. Like the *Turner* court, she contends that *Obergefell* only established two points of law: that marriage is a fundamental right the states cannot deny to same-sex couples and that all states must give full faith and credit to same-sex marriages performed in other states. *See Turner*, 242 Ariz. at 498 ¶ 15. Under this reading, *Obergefell* does not require extending statutory benefits linked to marriage to include same-sex couples; rather, it only invalidates laws prohibiting same-sex marriage. *Id.*

¶16　　　　Such a constricted reading, however, is precluded by *Obergefell* itself and the Supreme Court's recent decision in *Pavan v. Smith*, 137 S. Ct. 2075 (2017) (per curiam). In *Obergefell*, the Court repeatedly framed both the issue and its holding in terms of whether states can deny same-sex couples the same "right" to marriage afforded opposite-sex couples. *See* 135 S. Ct. at 2601 (noting that excluding same-sex couples from marriage denies them "the constellation of benefits the States have linked to marriage"); *id.* at 2602 (noting harms that result from denying same-sex couples the "same legal treatment as opposite-sex couples"); *id.* at 2604 (noting challenged laws were unequal because "same-sex couples are denied all the benefits afforded to opposite-sex couples").

¶17　　　　"The Constitution . . . does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex." *Id.* at 2607. Such broad statements reflect that the plaintiffs in *Obergefell* sought more than just recognition of same-sex marriages. Indeed, two of the plaintiffs were a female same-sex couple who challenged a Michigan law permitting opposite-sex couples, but not them, to both serve

as adoptive legal parents for the same child. 135 S. Ct. at 2595. These plaintiffs, the Court observed, deserved to know "whether Michigan may continue to deny them the certainty and stability" afforded by their children having two legal parents rather than one. *Id.* at 2606. And the benefits attendant to marriage were expressly part of the Court's rationale for concluding that the Constitution does not permit states to bar same-sex couples from marriage "on the same terms." 135 S. Ct. at 2607; *see id.* at 2601. It would be inconsistent with *Obergefell* to conclude that same-sex couples can legally marry but states can then deny them the same benefits of marriage afforded opposite-sex couples.

¶18 *Pavan*, decided after *Turner*, confirms our interpretation of *Obergefell*. In *Pavan,* an Arkansas law generally required that when a married woman gives birth, the name of the mother's male spouse appear on the birth certificate, regardless of the male spouse's biological relationship to the child. 137 S. Ct. at 2077. The Arkansas Supreme Court concluded that *Obergefell* did not require the state to similarly list the name of the mother's female spouse on the child's birth certificate, in part because the state law did not involve the right to same-sex marriage or its recognition by other states. *Smith v. Pavan*, 505 S.W.3d 169, 180 (Ark. 2016), *rev'd per curiam*, 137 S. Ct. 2075 (2017). The United States Supreme Court summarily reversed, stating that such differential treatment of same-sex couples infringed "*Obergefell's* commitment to provide same-sex couples 'the constellation of benefits that the States have linked to marriage.'" *Pavan*, 137 S. Ct. at 2077 (quoting *Obergefell*, 135 S. Ct. at 2601).

¶19 Consistent with *Obergefell* and *Pavan*, we must determine whether § 25-814(A)(1) affords a benefit linked to marriage and authorizes disparate treatment of same-sex and opposite-sex marriages. Clearly, § 25-814(A)(1) is an evidentiary benefit flowing from marriage. *See* Daniel J. McAuliffe & Shirley J. Wahl, Arizona Law of Evidence — Arizona Practice Series § 301:5(A), at 83 (4th ed. 2008) (citing § 25-814 as an example of a statutorily based evidentiary presumption). If a child is born during an opposite-sex marriage, the husband is presumed to be the child's legal parent. *See* A.R.S. §§ 25-803(C) ("When paternity is established the court may award legal decision-making and parenting time as provided in § 25-408."), -814(A)(1) (presuming husband is a legal parent of a child born during the marriage). Legal parent status is, undoubtedly, a benefit of marriage. *See Pavan*, 137 S. Ct. at 2078 (requiring Arkansas to list a non-biological, same-sex spouse on a child's birth certificate, which establishes

7

legal parenthood). That this evidentiary presumption is rebuttable does not alter the fact that § 25-814(A)(1) affords a benefit of marriage. *See* A.R.S. § 25-814(C); *cf. Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 144–45, 153 (1980) (classifying state statute as a benefit even though widowers could rebut evidentiary presumption of non-dependency).

¶20 On its face, § 25-814(A)(1) authorizes differential treatment of similarly situated same-sex couples. For instance, if a woman in an opposite-sex marriage conceives a child through an anonymous sperm donor, her husband will be presumed the father under § 25-814(A)(1) even though he is not biologically related to the child. However, when a woman in a same-sex marriage conceives a child in a similar fashion, her female spouse will not be a presumptive parent under § 25-814(A)(1) simply because the presumption only applies to males. Consequently, a female spouse in a same-sex marriage is only afforded one route to becoming the legal parent of a child born to her marital partner—namely, adoption— whereas a male spouse in an opposite-sex marriage can either adopt or rely on the marital paternity presumption to establish his legal parentage. Thus, applying § 25-814(A)(1) as written excludes same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples.

¶21 Kimberly counters that § 25-814(A)(1) is constitutional despite its disparate treatment of same-sex couples because it simply concerns identifying biological parentage. However, as the previous example illustrates, the marital paternity presumption encompasses more than just rights and responsibilities attendant to biologically related fathers. When the wife in an opposite-sex couple conceives a child, her husband is presumed to be the father even when he is not biologically related to the child. Thus, the *Turner* court incorrectly concluded that "biology—the biological difference between men and women—*is* the very reason the [paternity] presumption statute exists." 242 Ariz. at 499 ¶ 18. Because the marital paternity presumption does more than just identify biological fathers, Arizona cannot deny same-sex spouses the benefit the presumption affords. *See Pavan*, 137 S. Ct. at 2078 (holding that Arkansas could not deny listing non-biological same-sex spouses on birth certificates because it "ma[d]e its birth certificates more than a mere marker of biological relationships").

¶22 Like the *Turner* court, Kimberly errs in relying on *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53 (2001). *See Turner*, 242 Ariz. at 499 ¶ 18. In

*Nguyen*, the United States Supreme Court held that "the imposition of different rules" on mothers and fathers for proving their biological relationship to a child was not unconstitutional because "fathers and mothers are *not similarly situated* with regard to proof of biological parenthood." 533 U.S. at 54 (emphasis added). Biological parentage is not at issue here. Although a woman, Suzan is similarly situated to a man who is presumed to be a parent even though his wife conceived a child other than by him. Because this is a case where males and females are similarly situated but treated differently, *Nguyen* is inapposite.

¶23 In sum, the presumption of paternity under § 25-814(A)(1) cannot, consistent with the Fourteenth Amendment's Equal Protection and Due Process Clauses, be restricted to only opposite-sex couples. The marital paternity presumption is a benefit of marriage, and following *Pavan* and *Obergefell*, the state cannot deny same-sex spouses the same benefits afforded opposite-sex spouses.

**B.**

¶24 Kimberly argues that the Court cannot interpret § 25-814(A)(1) gender neutrally because doing so would effectively rewrite the statute, thereby invading the legislature's domain. Instead, Kimberly contends that this Court must wait for the legislature to remedy this constitutional defect. This argument misperceives this Court's constitutional role and responsibility when faced with a statute that violates the equal protection of the laws guaranteed by the Fourteenth Amendment.

¶25 To place the remedial issue in context, it is useful to review some settled constitutional principles. The United States Supreme Court's interpretation of the Constitution is binding on state court judges, just as on other state officers. *See Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958). When the Constitution conflicts with a statute, the former prevails. *Marbury v. Madison*, 5 U.S. 137, 178 (1803) (noting "the constitution is superior to any ordinary act of the legislature; [and] the constitution, and not such ordinary act, must govern the case to which they both apply"); The Federalist No. 78 at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961). It is no answer to a constitutional violation in a pending case to assert that it could be remedied by legislative action. "The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right." *Obergefell*, 135 S. Ct. at 2605.

¶26     When a statute grants benefits but violates equal protection, a court has "two remedial alternatives." *Califano v. Westcott*, 443 U.S. 76, 89 (1979). "[A] court may either declare [the statute] a nullity and order that its benefit not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion." *Id.* (quoting *Welsh v. United States*, 398 U.S. 333, 361 (1970) (Harlan, J., concurring in result)). State court judges face the same remedial alternatives when a benefit statute violates equal protection. *See Wengler*, 446 U.S. at 153 (remanding remedial question to state court because "state judges are better positioned to choose" whether extension or nullification of a state benefit statute is more "consonant with the state legislature's overall purpose"). This remedial choice is not confined to circumstances in which the state grants monetary benefits but instead applies to other statutory classifications violative of equal protection. *See, e.g., Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686–87 (2017) (concerning statutes conferring U.S. citizenship on children born abroad); *Welsh*, 398 U.S. at 361–63 (Harlan, J., concurring) (concerning statute authorizing exemption from military service for conscientious objectors).

¶27     Which remedial alternative a court elects "is governed by the legislature's intent, as revealed by the statute at hand." *Morales-Santana*, 137 S. Ct. at 1699. In making this assessment, a court should "measure the intensity of commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation." *Heckler*, 465 U.S. at 739 n.5 (quoting *Welsh*, 398 U.S. at 365 (Harlan, J., concurring in result)). Generally, the proper remedy is extension, not nullification. *Morales-Santana*, 137 S. Ct. at 1699.

¶28     Because § 25-814(A)(1) is now a constitutionally defective state-benefit statute, we must determine whether to extend the marital paternity presumption to similarly situated women such as Suzan or to nullify it altogether. Neither party here requests that this Court strike § 25-814(A)(1). This is unsurprising because extension, as opposed to abrogation, is more consonant with the purposes of the marital paternity presumption.

¶29     A primary purpose of the marital paternity presumption is to ensure children have financial support from two parents. The legislature originally enacted § 25-814(A)(1) in 1994 as part of sweeping changes to Arizona's child support statutes. *See* 1994 Ariz. Sess. Laws, ch. 374, § 5 (2d

Reg. Sess.) (originally numbered as A.R.S. § 12-854); 1996 Ariz. Sess. Laws, ch. 192, § 14 (2d Reg. Sess.) (renumbered as § 25-814). In locating § 25-814(A)(1) under Title 25, Article 1, the legislature expressly provided that a mother or father could commence paternity proceedings "to compel support under [Title 25, Article 1]." A.R.S. § 25-803(A). A presumptive father under § 25-814(A)(1) must pay child support unless clear and convincing evidence shows "paternity was established by fraud, duress or material mistake of fact." *See* A.R.S. § 25-503(A), (F). (So too must a non-biological mother in a same-sex marriage who agreed in writing to the insemination. *See* A.R.S. § 25-501(B).) Consequently, since § 25-814(A)(1)'s enactment, we have observed that the purpose of establishing paternity is to "reduce the number of individuals forced to enter the welfare rolls." *Hall v. Lalli*, 194 Ariz. 54, 59 ¶ 14 (1999); *see also Hurt v. Superior Court*, 124 Ariz. 45, 48 (1979) (noting that the purpose of paternity statutes is "to provide financial support for the child").

**¶30** To strike § 25-814(A)(1) would only undermine this important governmental objective. Because men in opposite-sex marriages are presumed to be legal parents through the marital paternity presumption, eliminating this presumption would increase the likelihood that children born to opposite-sex parents lack financial support from two parents. Extending the presumption, on the other hand, would better ensure that all children—whether born to same-sex or opposite-sex spouses—are not impoverished.

**¶31** The marital paternity presumption also promotes the family unit. The legislature declared that the general purpose of Title 25 is "[t]o promote strong families" and that it is generally in the child's best interest "[t]o have substantial, frequent, meaningful and continuing parenting time with both parents" and "[t]o have both parents participate in decision-making about the child." A.R.S. § 25-103(A)(1), (B)(1)-(2). The legislature also mandated that Arizona courts "shall apply the provisions of [Title 25] in a manner that is consistent with [§ 25-103]." *Id.* at § 25-103(C). When a man is presumed to be the father of a child born during the marriage, and that presumption is not rebutted, he is entitled to legal decision-making and parenting time with the child. *See* A.R.S. § 25-803(C). Thus, the marital paternity presumption seeks to ensure a child has meaningful parenting time and participation from both parents.

11

¶32     Extending the marital paternity presumption to same-sex spouses also better promotes strong family units.  In *Obergefell*, the Supreme Court concluded that the right to marry is fundamental in part because "it safeguards children and families."  135 S. Ct. at 2590.  By denying same-sex couples "the recognition, stability, and predictability marriage offers," the Court found that children of same-sex couples "suffer the stigma of knowing their families are somehow lesser" and "suffer the significant material costs of being raised by unmarried parents, relegated to a more difficult and uncertain family life."  *Id.*  Extending the marital paternity presumption mitigates these harms.  Children born to same-sex spouses will know that they will have meaningful parenting time with both parents even in the event of a dissolution of marriage.  By contrast, nullifying § 25-814(A)(1) would only impose these harms on children of opposite-sex spouses.

¶33     For these reasons, we extend § 25-814(A)(1) to same-sex spouses such as Suzan.  By extending § 25-814(A)(1) to same-sex spouses, we ensure all children, and not just children born to opposite-sex spouses, have financial and emotional support from two parents and strong family units.

¶34     We are not persuaded by our dissenting colleague's argument that this relief exceeds the proper role of the courts.  *Infra* ¶ 51.  The partial dissent acknowledges that, under *Obergefell* and *Pavan*, a state must afford "parenting rights to members of same-sex couples on an equal basis with opposite-sex couples."  *Infra* ¶ 50.  We honor that constitutional requirement by holding that Suzan must enjoy the same presumption of parentage under § 25-814(A)(1) as would a husband in an opposite-sex marriage.

¶35     "[W]hen the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class."  *Morales-Santana*, 137 S. Ct. at 1698 (alteration in original) (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)).  That courts must make such a choice does not reflect impermissible judicial "rewriting" of a statute; indeed, leaving intact a statute that violates the Equal Protection Clause would abdicate the courts' responsibility to uphold the Constitution.  In deciding between remedies, however, courts give deference to the legislature by considering whether withdrawal or

expansion better serves the statute's purposes. *Morales-Santana* reflects that fealty to a statute's purpose may result in eliminating a benefit. Here, as we have already explained *supra* ¶ 32, the evident purpose of the statute is better served by extending the presumption to same-sex couples.

¶36  *Obergefell* and *Pavan*, we acknowledge, will require a reassessment of various state statutes, rules, and regulations to the extent they deny same-sex spouses all the benefits afforded opposite-sex spouses. *See Obergefell*, 135 S. Ct. at 2601 (identifying the benefits of marriage affected by its holding as including: "taxation; inheritance and property rights; rules of intestate succession; spousal privilege in the law of evidence; hospital access; medical decisionmaking authority; adoption rights; the rights and benefits of survivors; birth and death certificates; professional ethics rules; campaign finance restrictions; workers' compensation benefits; health insurance; and child custody, support, and visitation rules"). That reassessment need not occur through case-by-case litigation.

¶37  Like the judiciary, the legislative and executive branches are obliged to follow the United States Constitution. U.S. Const. art. VI, cl. 2 (stating that the U.S. Constitution is "the supreme Law of the Land"); Ariz. Const. art. II, § 3 (same). Through legislative enactments and rulemaking, our coordinate branches of government can forestall unnecessary litigation and help ensure that Arizona law guarantees same-sex spouses the dignity and equality the Constitution requires—namely, the same benefits afforded couples in opposite-sex marriages. *See Pavan*, 137 S. Ct. at 2078; *Obergefell*, 135 S. Ct. at 2605.

### III.

¶38  Because Suzan is presumed a parent under § 25-814(A)(1), Kimberly argues that she is entitled to rebut Suzan's presumptive parentage. *See* § 25-814(C) (providing that "[a]ny presumption under [§ 25-814(A)] shall be rebutted by clear and convincing evidence"). Kimberly contends that the court of appeals erroneously denied her this right when it held that she was equitably estopped from rebutting Suzan's presumptive parentage. *See McLaughlin*, 240 Ariz. at 566–67 ¶¶ 20, 27. We disagree.

¶39  Equitable estoppel "precludes a party from asserting a right inconsistent with a position previously taken to the prejudice of another acting in reliance thereon." *Unruh v. Indus. Comm'n*, 81 Ariz. 118, 120 (1956); *see also Valencia Energy Co. v. Ariz. Dep't of Revenue*, 191 Ariz. 565, 576–77 ¶

35 (1998) ("The three elements of equitable estoppel are traditionally stated as: (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct." (footnote omitted)).

¶40        We have often applied equitable estoppel in our family law jurisprudence, including dissolution cases. *See Unruh*, 81 Ariz. at 120 (citing three decisions by this Court in which we estopped parties from challenging presumptively valid divorces). Further, other state supreme courts have applied equitable estoppel in paternity actions, including cases involving marital paternity presumption statutes similar to § 25-814(A)(1). *See, e.g.*, *Randy A.J. v. Norma I.J.*, 677 N.W.2d 630, 639–41 (Wis. 2004) (estopping a biological mother and putative father from rebutting a husband's presumptive paternity under a marital paternity presumption statute). Nothing prohibits Arizona courts from applying equitable estoppel to preclude the rebuttal of a statutory paternity presumption under § 25-814(A).

¶41        Here, Kimberly and Suzan agree that they intended for Kimberly to be artificially inseminated with an anonymous sperm donor and that Kimberly gave birth to E. during the marriage. During the pregnancy, they signed a joint parenting agreement declaring Suzan a "co-parent" of the child and their intent that the parenting relationship between Suzan McLaughlin and the child would continue if Suzan and Kimberly's relationship ended. After E.'s birth, Suzan stayed home to care for him during the first two years of his life. Thus, the undisputed facts unequivocally demonstrate that Kimberly intended for Suzan to be E.'s parent, that Kimberly conceived and gave birth to E. while married to Suzan, and that Suzan relied on this agreement when she formed a mother-son bond with E. and parented him from birth.

¶42        In response, Kimberly counters that applying equitable estoppel here imposes an irrefutable standard that only benefits same-sex marriages. We reject this argument for two reasons. First, all presumptions under § 25-814(A) are rebuttable. *See* § 25-814(C) ("*Any* presumption under [§ 25-814] shall be rebutted by clear and convincing evidence." (emphasis added)). For example, the presumption might be rebutted by evidence that the biological mother was artificially inseminated without the consent of her spouse. But based on the facts of this case, we conclude that Kimberly

is estopped from rebutting Suzan's presumptive parentage of E. As we explained, to do otherwise would be patently unfair. Second, equitable estoppel applies equally to spouses in same-sex or opposite-sex marriages. *Cf. In re Marriage of Worcester*, 192 Ariz. 24, 27 ¶¶ 7–8 (1998) (prohibiting a mother from rebutting her former husband's presumptive paternity under the marital paternity presumption "unless the mother is seeking child support from another").

**¶43** For the foregoing reasons, we hold that Kimberly is equitably estopped from rebutting Suzan's presumptive parentage of E.

**IV.**

**¶44** We vacate the court of appeals' opinion, affirm the trial court's ruling that Suzan is E.'s legal parent, and remand to the trial court for further proceedings consistent with this opinion.

LOPEZ, J., joined by PELANDER, V.C.J., concurring.

**¶45**  The majority correctly concludes that the Fourteenth Amendment to the United States Constitution, as interpreted by the United States Supreme Court in *Obergefell* and *Pavan*, entitles Suzan, the Real Party in Interest, to a presumption of parental status under Arizona law consonant with the rights conferred upon a husband in an opposite-sex marriage under similar circumstances. A.R.S. § 25-814(A)(1). I write separately to underscore what is at least implicit in the majority's opinion. We have not extended *Obergefell*; rather, the United States Supreme Court did so in *Pavan*, the recent opinion that not only expounds on *Obergefell*, but also forecloses debate on the breadth of that decision and dictates the outcome here. Today, we merely follow the United States Supreme Court's directive as the Supremacy Clause of the federal Constitution commands. U.S. Const. art. VI, cl. 2 (stating that the Constitution is "the supreme Law of the Land; and the Judges in every State shall be bound thereby . . . ."); *see also* Ariz. Const. art. II, § 3 (same). No more, no less.

**¶46**  The remedy in this case presents a more complex issue. The majority properly identifies our two imperfect remedial options: we may invalidate § 25-814(A), and jettison its sweeping applications beyond the facts of this case; or, alternatively, we may extend the statute's application, under the *Califano* rubric, to recognize Suzan's parental status as we would a similarly-situated, non-biological father. The majority properly implements the least imperfect available remedy, because extending rather than abrogating § 25-814(A) is "more consonant with the purposes of the marital paternity presumption." ¶ 28, *supra*.

**¶47**  In his partial dissent, Justice Bolick declines to join the majority's analysis and conclusion regarding the appropriate remedy in this case, labeling it "unnecessary, unwise, and beyond the proper scope of judicial power." ¶ 51, *infra*. Contrary to Justice Bolick's concern, however, the Court neither rewrites the statute nor improperly assumes the legislative prerogative. Instead, faced with a statute that (after *Obergefell* and *Pavan*) no longer can be constitutionally applied to only opposite-sex marriages, the Court necessarily and reasonably extends the statute to the same-sex couple here.

**¶48** Justice Bolick agrees with the result in this case and thus, like the majority, opts to affirm the family court's ruling that treats the parties' marital dissolution as one with children. But he does not convincingly explain how that result can obtain other than by extending § 25-814(A)(1)'s presumption to Suzan. Justice Bolick's primary justification for rejecting the majority's *Califano* remedy is that "the paternity statute does not offend the Constitution." ¶ 52, *infra*. This reasoning, however, misconstrues the application and scope of § 25-814(A)(1)'s presumption, which does more than just affect biological fathers, but also presumes parental rights for a man in an opposite-sex marriage whose wife conceives a child through artificial insemination by an anonymous donor. This disparate application of the paternity statute deprives this Court of the option to eschew a remedy here.

**¶49** The majority's approach is consistent with the rule of law as enunciated by the United States Supreme Court, which we are bound to follow. While circumstances require us to drive a remedial square peg into a statutory round hole here, nothing in the majority opinion prevents the legislature from fashioning a broader or more suitable solution by amending or revoking § 25-814 and other statutes as they may apply to other pending or future cases.

BOLICK, J., concurring in part and dissenting in part.

**¶50**        I agree with the majority that the United States Supreme Court's decision in *Pavan* unequivocally forbids states from denying parenting rights to members of same-sex couples on an equal basis with opposite-sex couples.   I also agree that the facts and equitable considerations make a compelling case for Suzan to have parenting rights. Suzan and Kimberly were a legally married couple when their baby was born.  Not only did they execute a co-parenting agreement in times that were happier between them, but Suzan rather than Kimberly would have been the birth mother had she been able to conceive through artificial insemination, which would have reversed the present circumstances.  I therefore join my colleagues in affirming the trial court's decision to proceed with this case as a marital dissolution with children.

**¶51**        With great respect, however, I cannot join the majority in rewriting our state's paternity statute, which is unnecessary, unwise, and beyond the proper scope of judicial power.  The marital presumption that the majority finds unconstitutional and rewrites, A.R.S. § 25-814(A)(1), is not, as the majority characterizes it, a "state-benefit statute."  *Supra* ¶ 28. Rather, it is part of an integrated, comprehensive statute that serves the highly important and wholly legitimate purpose of providing a mechanism to establish a father's rights and obligations.  Among other methods, it allows a person to rebut a marital presumption by evidence of biological parentage, which as the Court tacitly acknowledges, cannot apply to non-birth mothers in a same-sex marriage.   A.R.S. § 25-814(C); *see also* § 25-814(A)(2) (creating a parenthood presumption when genetic testing affirms at least 95% chance of paternity).  A paternity statute does not offend the Constitution because only men can be fathers. *See, e.g., Nguyen*, 533 U.S. at 63 (decision by Justice Kennedy holding that "[t]he imposition of a different set of rules . . . is neither surprising nor troublesome from a constitutional perspective" because they "are not similarly situated with regard to the proof of biological parenthood").  It is not the paternity statute that is unconstitutional, but rather the *absence* of a mechanism to provide parenthood opportunities to single-sex couples on equal terms appropriate to their circumstances. *See Pavan*, 137 S. Ct. at 2078 (guaranteeing "access" to the same rights, benefits, and responsibilities as opposite-sex couples).

**¶52**        Because the paternity statute does not offend the Constitution, no basis exists for the Court to "extend" the marital

presumption "benefit," which has the necessary consequence of transforming the nature of the statute and rendering it incoherent. *See Morales-Santana*, 137 S. Ct. at 1689–91 (applying remedial framework from *Califano* to a statute that contained express gender-based preferences based on "once habitual, but now untenable, assumptions" of "male dominance in marriage."); *id.* at 1700 (finding benefit extension inappropriate in light of "potential disruption of the statutory scheme"); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 662 (2012) (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) ("[W]e cannot rewrite the statute to be what it is not. Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it." (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986)) (internal quotation marks omitted)); *State ex rel. Polk v. Campbell*, 239 Ariz. 405, 408 ¶ 12 (2016) ("We decline to effectively, if not actually, rewrite [the statute], as that is the legislature's prerogative, not ours."). It is the legislature, not this or any court, that should determine how best to write or rewrite family law statutes in a constitutionally compliant manner that makes sense of the entire scheme.

¶53 While the Court properly applies *Pavan* to find unconstitutional the State's failure to provide a parenthood mechanism for same-sex couples and to sustain the trial court's order treating Suzan and Kimberly's marital dissolution as one involving children, it should continue these proceedings to determine additional appropriate remedies. The State intervened in this lawsuit, then withdrew notwithstanding the remaining challenge to the constitutionality of its statutes. The State should be made a party to the lawsuit to enable the Court to properly evaluate and determine appropriate remedies.